**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

**CIVIL ACTION NO. _____**

| | | |
|---|---|---|
| **MANAL ABDELMALEK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **COMPLAINT** |
| | ) | **(Jury Trial Demanded)** |
| **DUKE UNIVERSITY** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

Now comes Plaintiff, complaining of Defendant, and alleges as follows:

## INTRODUCTION

1.    Plaintiff is a tenured Full Professor and physician working in the Division of

Gastroenterology ("GI Division") within the Department of Medicine at Duke University

Medical Center.

2.    Plaintiff is one of the world's leading experts on non-alcoholic fatty liver disease

("NAFLD") and has brought in research grants totaling more than $10 million dollars to

Defendant.

3.    Plaintiff is an Egyptian female who immigrated to this country as a young child with her

family to escape religious persecution.  She is a naturalized citizen of the United States.

4.    Plaintiff has been subjected to discrimination on the basis of her gender and her

race/national origin ("ethnic discrimination") by Defendant.

5.    Plaintiff has objected to this unlawful discrimination by Defendant on numerous

occasions and has filed three separate Charges of Discrimination with the Equal Employment

Opportunity Commission ("EEOC').

6.      As a result of her objections to gender and ethnic discrimination, Plaintiff has suffered retaliation by Defendant.

7.      Defendant's discrimination and retaliation against Plaintiff has included a pattern of adverse actions against Plaintiff as follows:

- Delaying her promotion to full professor

- Denying her proper and equitable salary

- Denying her earned financial research incentives

- Denying her earned clinical performance incentives

- Denying her the appropriate staffing for her clinical practice

- Subjecting her to unjustified disciplinary measures including performance improvement plans founded on hearsay and anonymous complaints

- Threatening to discharge her

- Subjecting her to unwarranted investigations and audits based upon anonymous complaints

- Falsely accusing two of her ethnic minority staff members of improper conduct and performance

8.      Plaintiff's claims for race/national origin discrimination and retaliation are brought under Title VII of the Civil Rights Act of 1964 ("Title VII") as amended by the Civil Rights Act of 1991 and set forth in 42 U.S.C. § 2000e, *et seq.* and under 42 U.S.C. § 1981 ("Reconstruction Era Statutes").

9.      Plaintiff's claims of gender discrimination are brought under Title VII and the Equal Pay Act of 1963, 29 U.S.C. § 206(d)(1) *et seq.*

10.     Plaintiff also makes claims under the N. C. Wage and Hour Act, N.C. Gen. Stat. § 95-25.1 *et seq.*, for failure to pay financial incentives and other compensation due to her.

11.     Plaintiff seeks injunctive relief, monetary relief, compensatory damages, liquidated damages, punitive damages, and attorney's fees pursuant to 42 U.S.C. § 2000e(g), 29 U.S.C. § 216(b),  N.C. Gen. Stat. § 95-25.22, and 42 U.S.C. §1981A(b).

## JURISDICTION AND VENUE

12.     The jurisdiction in this Court is invoked pursuant to 42 U.S.C. § 2000e, 42. U.S.C. § 1981, 38 U.S.C. § 4323(b)(2), 28 U.S.C. § 1337, and 28 U.S.C. § 1343(4).

13.     This Court should assume supplemental jurisdiction of Plaintiff's state law claims for violation of the North Carolina Wage and Hour Act under 28 U.S.C. § 1367(b) because these claims are based upon the same operative facts as the federal claims over which the Court has jurisdiction, and judicial economy, convenience and fairness to the parties demand that the Court assume and exercise jurisdiction over all claims alleged herein.

14.     The venue of this Court over this controversy is based upon the following:

   a.     The unlawful employment practices alleged herein were committed in the Middle District of North Carolina.  Accordingly, venue lies in the United States District Court for the Middle District of North Carolina under 28 U.S.C. § 1391(b); and,

   b.     Plaintiff avers that Defendant is a non-profit corporation doing business in this judicial district within the meaning of 28 U.S.C. § 1391(c).

## PARTIES

15.     Plaintiff is a citizen and resident of Durham County, North Carolina.

Case 1:19-cv-00664-CCE-LPA   Document 1   Filed 07/03/19   Page 3 of 39

16.     Defendant Duke University ("Defendant" or "Duke") is a corporation existing under the laws of North Carolina and operating Duke University Medical Center and Duke University Medical School in Durham, NC.

17.     The following persons acted as the employees and agents of Defendant and within the course of scope of their agency with regard to all of the matters set forth in the Complaint:

- Dr. Mary Klotman (white female, U.S. national origin), former Chair of the Department of Medicine and currently Dean of the School of Medicine.

- Dr. Joseph Rogers (white male, U.S. national origin), Interim Chair of the Department of Medicine

- Dr. Ann Brown (white female, U.S. national origin), Assistant Dean of the School of Medicine

- Dr. Laura Svetsky (white female, U.S. national origin), Assistant Dean of the School of Medicine

- Dr. Andrew Muir (white male, Australian national origin), Chief of the Division of Gastroenterology, Department of Medicine

- Cathy O'Neill (white female, U.S. national origin), Business Manager, Division of Gastroenterology

- Tammy Bishop (white female, U.S. national origin), Assistant Research Practice Manager ("ARPM"), Department of Medicine, Clinical Research Unit

18.     All of the above-referenced employees and agents exercised management authority for Defendant with regard to Plaintiff's employment.

19.     At all times relevant to this Complaint, Defendant employed more than 500 employees for each working day in each of the twenty or more calendar weeks in the current or preceding calendar year.

20.     At all times relevant to this Complaint, Defendant has been an employer of Plaintiff under the provisions of the Fair Labor Standards Act, 29 U.S.C. 203(d), and thereby subject to the Equal Pay Act, 29 U.S.C. § 206(d)(1).

21.     At all times relevant to this Complaint, Defendant has been a "person" as defined in the North Carolina Wage and Hour Act, N. C. Gen. Stat. 95-25.2 (11).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

22.     Plaintiff timely filed three separate Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), designated as EEOC Charge Nos. 433-2018-00498, 433-2018-02172, and 433-2018-03468.

23.     On or about April 22, 2019, the EEOC issued Notices of Right to Sue to Plaintiff with regard to each of these Charges of Discrimination.

24.     Plaintiff has exhausted all of her administrative remedies under Title VII of the 1964 Civil Rights Act.

## STATEMENT OF FACTS

### Plaintiff's Background

25.     Plaintiff was born in 1968 in Cairo, Egypt.

26.     Plaintiff is a married female with two children.

27.     All of the employees and agents of Defendant identified above knew Plaintiff is female.

28.     Plaintiff has olive-colored skin and a broad nose, giving her a non-white appearance.

5

29.     Because of her physical characteristics, Plaintiff is often asked where she is from and whether she is African-American or Hispanic.

30.     Plaintiff is proud of her Egyptian heritage and tells people that she is Egyptian.

31.     All of the employees and agents of Defendant listed above were aware that Plaintiff is a non-white Egyptian.

32.      Plaintiff is a Coptic Christian, part of a religious minority that was persecuted by Muslim authorities in Egypt.

33.     Because of religious persecution, Plaintiff's family immigrated to the United States when she was five years old and she was raised in St. Louis, Missouri.  Plaintiff is a naturalized United States citizen.

34.     Plaintiff graduated from a combined BA-MD 6-year program at the School of Medicine at the University of Missouri—Kansas City in 1992.

35.     Plaintiff did a residency in Internal Medicine at the Mayo Clinic in Rochester, Minnesota and fellowship in Gastroenterology and Hepatology at Mayo Clinic sites in Rochester and Scottsdale, Arizona in 1998.

36.     Plaintiff obtained a Master's degree in Public Health with a Concentration in Epidemiology from the University of Florida in 2004.

37.     Plaintiff is board-certified by the American Board of Medicine as a Diplomate in three separate specialties: Internal Medicine, Gastroenterology, and Hepatology.

38.     From August 1998 until March 2006, Plaintiff was employed by the University of Florida, College of Medicine, Gainesville, Florida, as a physician and professor.  Her final position there was as an Associate Professor with tenure.

39.     In March 2006, Plaintiff was recruited to come to Defendant by the former Chief of the GI Division, Dr. Anna Mae Diehl (white female, US national origin).

40.     One of the world's leading experts on non-alcoholic fatty liver disease, Plaintiff has published more than a hundred academic papers in medical journals about research on the disease.

41.     Plaintiff serves as a reviewer and referee for more than twenty learned medical journals and is regularly invited to national and international conferences to speak about liver disease.

42.     In addition to her research, Plaintiff has a very busy clinical practice at Duke, treating patients with liver disease and other gastroenterological conditions.

43.     With over 20 years in clinical practice, Plaintiff has never had a malpractice claim made against her.

44.     Plaintiff is consistently given high ratings by her patients for her care of them.

45.     Plaintiff has won three different Patient Choice Awards during her time at Duke.

46.     Plaintiff has served as a mentor for residents, fellows and graduate students at Duke.

47.     Although she had been tenured at the University of Florida, Plaintiff joined Duke as a tenure-seeking Associate Professor in 2006.

### Duke's Discriminatory Culture

48.     Defendant's Medical Center has a history of favoring men over women  promotion and compensation.

49.     Defendant's Medical Center has a pattern and practice of paying male employees more than female employees who have equal or better training, experience and performance.

50.     Defendant's Medical Center has a pattern and practice of paying white employees more than non-white employees who have equal or better training, experience and performance.

7

51.     Defendant's Medical Center has a pattern and practice of favoring and more readily promoting men over women.

52.     Defendant's Medical Center has a pattern and practice of selecting physicians for leadership positions without advertisement or open talent search, thereby denying ethnic minority women of equal or more experience or accomplishment the opportunity to assume leadership positions.

53.     Duke University Medical Center has a policy and procedure for granting tenure to the physicians who work there.

54.     The tenure policy requires physicians to submit a dossier detailing the academic and clinical accomplishments of the applicants for tenure.

55.     A tenure and promotion committee compares the qualifications and accomplishments of the applicants for tenure and makes a decision as to whether tenure should be granted.

56.     Physicians who receive promotion are given the rank of Associate Professor and, after a subsequent review, Full Professor. Tenure and promotion to Full Professor are awarded to those with outstanding academic accomplishment.

57.     Those granted promotion to rank of  Full Professor have equivalent qualifications and accomplishments under Defendant's tenure policy.

58.     The American Association of Medical Colleges (AAMC) compiles statistics showing the percentages of men and women who have been promoted to Full Professor on medical school faculties throughout the United States and their salaries.

59.     For both 2014 and 2015, all of the other medical schools in North Carolina supplied this data to the AAMC.   Duke refused to do so.

60.     On information and belief, Duke continues to refuse the AAMC such data for the years since 2015.

**Salary Equity Data from the GI Division**

61.     After Plaintiff filed her original Charge of Discrimination against Duke on November 13, 2017, Defendant undertook an examination of gender equity for salaries within the GI Division.

62.     On November 28, 2017, GI Division Chair Muir did a presentation of the salary equity data for the GI Division.

63.     Muir's presentation showed that within the GI Division, women are being paid less than men who share the same faculty rank.

64.     Muir's presentation showed that women performing the same jobs as men in the GI Division are paid at least10% less than the men.

65.     Muir's presentation showed that in 2017, the GI department had 3 women and 6 men who were Full Professors.

66.     Plaintiff is informed and believes that the Full Professors in the GI Division with non-VA appointments included in the presentation were follows:

- Dr. Andrew Muir (white male, Australian national origin)

- Dr. Martin Henry Poleski (white male, Canadian national origin)

- Dr. Carl Berg (white male, US national origin)

- Dr. Malcolm Stanley Branch (white male, US national origin)

- Dr. Paul Simon Jowell (white male, South African national origin)

- Dr. Mahfuzul Haque (South Asian male, Bangladesh national origin)

- Dr. Anna Mae Diehl (white female, US national origin)

- Dr. Joanne A. Peebles Wilson (black female, US national origin)

- Dr. Manal Abdelmalek (Non-white female, Egyptian national origin)[1]

67.     Like all of the physicians in the GI Division, Plaintiff does clinical work, treating patients with gastrointestinal disease.

68.     Plaintiff performs work of equal skill, effort and responsibility and under similar working conditions as the men in the GI Division, including the men who are classified as Full Professors.

69.     Plaintiff's qualifications, experience, work duties and responsibilities are substantially similarly to each of the physicians identified above as Full Professors and her performance has been equal to or better than theirs.

70.     On information and belief, Plaintiff has been paid and continues to be paid less than each of the men who are Full Professors in the Division of Gastroenterology.

71.     In his presentation of salary equity data, GI Division Chair Muir failed to provide sufficient data to allow a comparison of particular males in the GI division to particular females, but he did state that women are generally being paid 10% less than men.

72.     GI Division Chair Muir provided no data sorted by ethnicity, so that Plaintiff was unable to compare herself to her specific counterparts in the GI Division by race or national origin.

73.     The presentation showed that according to AAMC data for 2016, the median base compensation for a Full Professor in programs comparable to the Duke GI Division was $329,025 dollars.

---

[1] Dr. Muir's presentation showed only 6 male Full Professors and 3 females.  Even though Dr. Rodger A. Liddle (white male, US national origin) and Dr. Dawn T. Provenzale (white female, US national origin) are also ranked as Full Professors in the GI Division, Plaintiff believes they were not part of Muir's presentation because they work full-time at the Durham Veterans Administration Medical Center.

Case 1:19-cv-00664-CCE-LPA   Document 1   Filed 07/03/19   Page 10 of 39

74.     The presentation showed that according AAMC data for 2016, the median total compensation for a Full Professor in programs comparable to the Duke GI Division was $423,325 dollars.

75.     Plaintiff is informed and believes that the male Full Professors were being paid more than these median amounts in 2017 and continue to be paid more these median amounts.

76.     Plaintiff was being paid less than these median amounts in 2017 and continues to be paid less.

77.     Plaintiff is informed and believes that Dr. Joanne A. Peebles Wilson, a black female, is the lowest paid Full Professor in the Division.

78.     On multiple occasions since she filed her first Charge of Discrimination, Plaintiff has requested that the GI Division Business Manager, Cathy O'Neill, provide her with the salary equity data for the Division so that she can specifically compare her salary to that of the others in the Division.

79.     GI Division Chair Muir has instructed Business Manager O'Neill not to provide the data.

80.     Plaintiff also requested similar salary equity data from School of Medicine Vice Dean for Finance, Mr. Billy Newton.

81.     All of her requests for salary equity data have been rejected, both at the level of the Division and the School of Medicine.

82.     On information and belief, female doctors in the GI Division are paid less than comparable men.

83.     On information and belief, non-white doctors in the GI Division are paid less than comparable white doctors.

84.     On information and belief, non-U.S. origin doctors in the GI Division are paid less than comparable U.S. origin doctors.

85.     Although Dr. Muir said during his oral presentation that he was going to establish a committee to examine salary equity data in the GI Division, that committee has failed to provide any type of written report that would allow a specific comparison of male/female salaries or salaries broken down by racial or national origin category.

### Dr. Andrew Muir

86.     When Plaintiff came to Duke, Dr. Andrew Muir was another physician practicing within the GI Division who also specialized in liver disease.

87.     Dr. Muir attended Duke University as an undergraduate, went on to Duke University Medical School and did his residency at Duke in internal medicine and gastroenterology, serving as the Chief Resident.

88.     Dr. Muir was born in Australia and became a U.S. citizen in 2010.

89.     Because of his long association with Duke, Dr. Muir has fully absorbed, endorsed and adopted the culture and employment practices of Duke, including the long-standing practice of favoring men over women and favoring employees whose national origin is the US over those who are from foreign countries.

90.     Over the course of his career, Dr. Muir has favored men over women and US origin employees over non-US origin.

91.     When Dr. Muir has hired physicians who are not from the US or who are non-white, he has kept them in subordinate positions and used them to support his own work, rather than supporting their career advancement.

92.     In general, Dr. Muir has failed to promote the careers of women and non-U.S. origin employees beyond the associate professor level.

93.     Under Dr. Muir, the following female and non-U.S. origin employees have left the GI Division:

- Keyur Patel, MD (South Asian male, Indian-Australian origin)—tenured Associate Professor

- Hans Tillman, MD (white male, German origin)—Associate Professor

- Alastair Smith, MD (white male, Scottish origin)—Associate Professor

- Ayako Suzuki, MD, PhD (Asian female, Japanese origin)—Assistant Professor

- Iliana Bouneva, MD (white female, Bulgarian origin)—Associate Professor

94.     By contrast, Dr. Muir has been instrumental in promoting and supporting the following employees:

- Stan Malcolm Branch (white male, US origin)

- Paul Simon Jowell (white male, US origin)

- Ziad Gellad, (white male, US origin)

- Andrew Ira Wolf (white male, US origin)

- Debra Fisher (white female, US origin)

- Katie Garman (white female, US origin),

- Melissa Gail Teitelman-Grotegut (white female, US origin)

- Rebecca Ann Burbridge, MD (white female, US origin)

- Clara Brady (black female, US origin)

13

95.     During a conversation with Dr. Muir in Spring 2016, Plaintiff expressed her concerns that she was being treated unfairly and misjudged by Duke leadership because of inherent bias toward minority women and how he had portrayed her to upper leadership.

96.     Dr. Muir said that Duke is a white male-dominated Southern institution with deep-rooted cultural norms.

97.     Dr. Muir also admitted that Duke has adopted cultural norms of the South which define how minorities and woman should behave.

98.     Dr. Muir specifically stated that the male leadership administering the clinical research programs were "sexist."

99.     Instead of pledging to help protect Plaintiff and/or resist this culture, Dr. Muir recommended that Plaintiff learn to adapt to it by learning "soft skills" and "how to navigate" the complex matrix of Duke.  He advised the Plaintiff that if she could not adapt to the cultural norms of Duke, then she should leave.

100.    This advice was ironic, because in prior public interviews regarding his own success, Dr. Muir had stated "the key to having a successful research and clinical career at Duke: be assertive."

101.    Plaintiff is an assertive person.  As a result of the persecution her family faced for their religion and culture, Plaintiff was taught to stand up for what is right and denounce injustice.

102.    Dr. Muir did not and does not want Plaintiff to be assertive.

103.    Dr. Muir expects Plaintiff, as an ethnic minority female, to be passive and subservient.

104.    Dr. Muir has adopted a stereotypical discriminatory bias and attitude toward her that is inherent to the historical norms and culture of the Duke University and its leadership.

105.     Because Defendant has been unable to find any substantive fault with Plaintiff's performance as a researcher or physician, Defendant has instead used the following methods to "justify" adverse employment actions against her:

- Implementing intensive investigations of her and her program based on anonymous allegations.

- Causing the repeated audit of her research program based on anonymous allegations.

- Accusing her of "unprofessional" conduct based on subjective criteria without conducting a thorough investigation or providing Plaintiff the opportunity to question the alleged complainant.

- Bringing her before the Dean's Advisory Council for false reasons founded on anonymous allegations and hearsay paraphrasing another person (typically Dr. Muir).

- Encouraging clinical  staff to make negative anonymous reports about Plaintiff behind her back.

- Encouraging staff who manage clinical research to obtain negative information about Plaintiff, even to the point where her staff felt harassed and pressured to comply with the request.

- Judging Plaintiff's performance based on phony subjective criteria, not objective metrics of performance.

- Condoning, participating in, and/or encouraging sexist comments about body language, tone or demeanor, such Dr. Muir repeatedly telling Plaintiff that he does not like her body language."

106.    As set forth below, Dr. Muir and the Duke administration have used these methods to take a wide variety of adverse employment actions against Plaintiff.

107.    Dr. Muir's adverse actions against Plaintiff and have been ratified by Duke administrators including Department of Medicine Chair, now Dean, Dr. Mary Klotman, Interim Department Chair Dr. Joe Rogers, Dr. Anne Brown, Dr. Laura Svetsky.

108.    The adverse employment actions against Plaintiff have been motivated by gender and ethnic discrimination.

109.    After Plaintiff filed the first written Charge of Discrimination against Duke on November 13, 2017, Dr. Muir retaliated against her and redoubled his efforts to drive her from Duke.

110.    When Plaintiff has objected to the sex and ethnic discrimination against her or refused to acknowledge the accuracy of allegations made by Dr. Muir, he has accused her of a failure to take ownership of her actions and used her objection to discrimination as a reason to withhold pay from her and place her on a continued performance improvement plan.

## Plaintiff's Early Encounters with Dr. Muir

111.    Upon Plaintiff's arrival at Duke in 2006, Dr. Muir assumed he could control her and use her to support his own work because she was a female from Egypt.

112.    Plaintiff outranked Dr. Muir when she arrived in 2006 as an Associate Professor because he was an untenured Assistant Professor.

113.    Dr. Muir did research on the Hepatitis C virus ("HVC"); Plaintiff did research on non-alcoholic fatty liver disease.

114.    Dr. Muir nevertheless sought to serve as Plaintiff's mentor and reporting manager in his position as Director of Site-Based Research.

16

115.    Plaintiff successfully argued that she should report to Dr. Anna Mae Diehl, not Dr. Muir, and that she should be allowed to develop and lead an independent research program for NAFLD while Dr. Muir independently led the HCV research program.

116.    The Site-Based Research Programs within the GI Division were divided into two separate fiscally independent research hubs, one for HCV and another for NAFLD.

117.    Ever since that time, Dr. Muir has been working to undermine Plaintiff and assume control of her research.

118.    Since Plaintiff's arrival at Duke, a cure has been developed for Hepatitis C, such that research dollars to support Muir's specialized research in that area have been greatly reduced.

119.    By contrast, NAFLD research, Plaintiff's area of specialty, has been vibrant and well-funded.  It has seen strong scientific advances, in part because of the efforts of Plaintiff and her Duke mentor, Dr. Anna Mae Diehl.

### Dr. Muir Reprimands Plaintiff for Speaking Her Native Language to a Patient

120.    In 2008, Dr. Muir was serving as the GI Division's Manager of Clinical Practice.  In this position he helped to oversee the management of patients with liver disease.

121.    In early August 2008, Plaintiff was treating a hospitalized patient from Winston-Salem, a 31-year-old lawyer, whose liver transplant had been performed at Duke. This particular patient had a complication requiring a repeat transplant.

122.    Plaintiff was consulting with the patient and her distraught mother, who were both Egyptian.  The mother's primary language was Arabic.

123.    Other personnel from the transplant program were present during Plaintiff's encounter with the patient and her mother.

17

124.    Because the patient's mother did not understand what Plaintiff was saying in English, Plaintiff switched to Egyptian Arabic to ensure that patient' mother comprehended the discussion.

125.    Plaintiff explained to them the medical issues and need for re-transplantation.

126.    After she had finished, she told the staff in the room what she had said in English.

127.    On August 13, 2008, Dr. Muir met with Plaintiff and informed her that he had two anonymous complaints about her interactions with this patient and her speaking Arabic in the presence of other Duke employees.

128.    Dr. Muir reprimanded Dr. Abdelmalek for speaking Arabic to the patient and her mother, telling her that her use of their native tongue was "unprofessional."

### Dr. Muir Attempts to Take Plaintiff's Research Funds

129.    In 2010, at a time when Dr. Muir had overspent his own research budget, Plaintiff discovered that Muir had removed $63,000 from one of her research accounts and placed it in his own overdrawn research account.

130.    Plaintiff reported the unauthorized transfer of funds to then Division Chief Anna Mae Diehl who reprimanded Dr. Muir and restored the funding to Plaintiff's account.

### Dr. Muir Uses His New Authority as Division Chief Against Plaintiff

131.    In May 2014, Dr. Anna Mae Diehl was removed as the GI Chair and Dr. Muir was appointed as the new Chair by then Chair of Medicine Klotman.  This change was announced without the job being opened for other candidates or explanation of the change.

132.    Once he became GI Division Chief, Dr. Muir did everything possible to seize control of Plaintiff's funding and her research program.

Case 1:19-cv-00664-CCE-LPA   Document 1   Filed 07/03/19   Page 18 of 39

133.    In 2015, within a year of becoming Chair, Division Chief Muir obstructed an opportunity for Plaintiff to bring a multicenter study to the Duke Clincial Research Institute (DCRI) where he also served as Director of GI Research.

134.    To get the grant, Plaintiff asked Dr. Muir to appoint her as a salaried employee at the Duke Clinical Research Institute (known as "Faculty A" appointment).

135.    This appointment would have allowed her to act as the Coordinating Principal Investigator for the proposed clinical trial.

136.    In his authority as both Director of Gastroenterology and Hepatology Research at the Duke Clinical Research Institute and as Chief of the GI Division, Muir refused to support Plaintiff's appointment.

137.    Muir instead proposed that he would serve as the Coordinating Principal Investigator, thereby allowing him to control the proposed $3 million dollar grant.

138.    The grant was for a study that was within Plaintiff's area of expertise, not Dr. Muir's.

139.    Dr. Muir nevertheless sought to control the approximately $3,000,000 in funding that would have come with the clinical trial.

140.    Plaintiff had written the protocol, secured collaborative participating sites, and obtained FDA approval for the clinical trial.  She should have been allowed to act as the Principal Investigator for the study.

141.    Dr. Muir did not want a female, especially an ethnic minority female, to obtain the prestige from the clinical trial and the financial control of the research funds at the DCRI.  His mode of operation has been to use ethnic minorities to advance his own career.

142.    Because of Dr. Muir's refusal, Plaintiff took the grant outside of Duke and contracted for the coordination of the clinical trial to take place elsewhere.  She successfully completed the work.

143.    This grant was unusual because the work was coordinated by an alternative clinical research organization while allowing Plaintiff to maintain her role as Principal Investigator

144.    Due to the nature of Plaintiff's other ongoing research (collaborative clinical-translational research studies and clinical trials), none of her other work can be readily moved away from Duke.

145.    If Plaintiff is forced out of Duke, or voluntarily leaves Duke because of the ongoing discrimination against her, Dr. Muir will effectively inherit millions of dollars in research funds and become the Principal Investigator on more than twenty-five ongoing clinical studies and a program of 18+ employees.

146.    Dr. Muir has attempted to drive Plaintiff away from Duke and assume control of her research, believing that he can do so because she is an ethnic minority female who will not be able to resist him.

147.    Dr. Muir has used his position as GI Division Chief to underpay Plaintiff, deny her earned financial incentives, delay her promotion to Full Professor, deny her administrative and clinical support, place her on unjustified Performance Improvement Plans, and tarnish her opportunities for leadership and advancement.

**<u>Dr. Muir Delays Plaintiff's Promotion to Full Professor</u>**

148.    During 2015, Division Chief Muir delayed Plaintiff's application for promotion to the rank of Full Professor.

149.    By Spring 2015, Plaintiff had prepared her dossier and submitted it to Muir for forwarding to the tenure committee.

150.    Instead of advancing Plaintiff's promotion dossier, Division Chief Muir submitted his own dossier and that of another male candidate.

151.    There was no reasonable justification for Muir to advance his own dossier and that of the other male professor to the tenure committee instead of Plaintiff's.

152.    Plaintiff's promotion to the rank of Full Professor was thereby delayed for two years by Dr. Muir.

153.    By delaying Plaintiff's promotion, Dr. Muir ensured that he could advance to Full Professor more quickly than she did, although he was 3 years her academic junior.

154.    As a result of Plaintiff's delayed promotion, she lost additional salary and benefits that would have accompanied her promotion to rank of Full Professor with tenure.  She continues to suffer these financial losses on an ongoing basis.

**Plaintiff Complains About Gender Discrimination At A Meeting**

155.    On March 2, 2016, Plaintiff attended a meeting to discuss giving one of staff members access to Duke's new electronic medical records.  During the meeting, Dr. Ken Lyles (white male, US origin), the Director of the Duke Clinical Research Unit, threatened Plaintiff saying that he would like to "ring [her] neck."

156.    Plaintiff calmly explained that she had worked hard to earn her position and her seat at the table.  She told him that his comments were "unprofessional."

157.    This exchange took place in the presence of Dr. Muir and Business Manager O'Neill, both of whom remained silent during the meeting and did not renounced the hostile statement by a Duke administrator.

158.    On March 4, 2016, Plaintiff complained to Dr. Muir about the way she had been treated, saying that she felt the leadership at Duke was hostile toward her and had slandered her character and style because of her gender and ethnicity.

159.    Plaintiff complained about the fact that such discrimination enforces the "glass ceiling" for women and particularly for minority women at Duke in academic medicine.

160.    Dr. Muir responded by telling Plaintiff that Duke is a Southern sexist institution and that she simply needed to do her best to get along and learn "soft skills."

161.    Dr. Muir told her that if she could not conform to these cultural norms at Duke, then she should just leave the University.

162.    Dr. Muir recommended that Plaintiff attend executive coaching and counseling.  Plaintiff followed his advice, even though the issue she had raised was institutional bias and lack of inclusion as it pertains to gender and ethnic differences.

163.    Instead of addressing the concerns about discrimination raised by Plaintiff, Dr. Muir condoned the behavior of his white male colleague and expected Plaintiff to accept it.

### Dr. Muir Denies Plaintiff Proper Salary

164.    On or about July 1, 2016, Plaintiff requested a salary increase to a level of $350-400K, commensurate with the amount of money that she was bringing into the University and what she understood her white male counterparts were being paid.

165.    Plaintiff's request for the increase was an equity adjustment to bring her up to the level of male physicians in the Department of Medicine with credentials, experience and training equal to or less than hers.

166. The Chair of the Department of Medicine at that time, Dr. Mary Klotman, approved a salary increase to $325,000, but Dr. Muir blocked this increase and set Plaintiff's salary at only $307,500.

167. Plaintiff's salary was set at this level despite the fact that she had brought more than $10,000,000 in research grant money into Duke and had ample money from her grant funding to pay the additional salary after covering all her direct research costs.

### Plaintiff Appears Before the Dean's Faculty Advisory Council

168. In order to implement an administrative path which could lead to termination, Dr. Muir worked with administrators at Duke to formulate a complaint against Plaintiff and have her brought before the Dean's Advisory Council.

169. In consultation with Dr. Mary Klotman (then-Chair of Medicine), Dr. Muir worked with Dr. Anne Brown and Dr. Laura Svetsky to accuse Plaintiff of a "lack of professionalism."

170. Based upon these false accusations, Plaintiff had to appear before the Dean's Advisory Council.

171. The Council hearing was conducted before eight faculty members without any recognized form of due process for Plaintiff.

172. Duke was represented by its counsel, Kate Hendricks. Plaintiff was denied the right to have counsel present.

173. Duke proceeded with evidence presented by Dr. Muir based on hearsay and anonymous complaints. Plaintiff was not allowed to confront, address or question her supposed accusers.

174. The Faculty Advisory Council did not thoroughly investigate the hearsay complaints and instead endorsed Dr. Muir's report.

175.    The recommendation of the Council went to the new dean, Dr. Mary Klotman, for a decision.

176.    Dean Klotman made a decision based upon a recommendation she herself had made when she was the Chair of Medicine. Klotman's ruling upon her own recommendation was a clear conflict of interest and obvious violation of due process.

177.    These procedures were not just unfair to Plaintiff. They were a violation Defendant's own policies and the fundamental right of due process.

### Plaintiff is Subjected to Unwarranted Investigations and Audits

178.    Within the last year and a half, Plaintiff has been subjected to repeated and unwarranted audits and investigations and heightened scrutiny by Defendant's leadership.

179.    Despite going through routine and regular audits by several regulatory oversight entities (corporate study sponsors, contract research organizations, Defendant's own Office of Compliance), Plaintiff's research program has been subjected to a billing, compliance, and regulatory audit based on "anonymous" complaints.

180.    One such audit was conducted while Plaintiff was away at an international meeting of the European Association for the Study of Liver Disease (EASL) from April 8-13, 2018. Defendant refused to delay the audit pending Plaintiff's return.

181.    On all counts, the April 2018 audit showed no improper actions by Plaintiff or any substantial discrepancies in her research.

182.    Thereafter, in May 2018, based upon other "anonymous" allegations, an outside lawyer was brought in to interview Plaintiff's staff about her alleged lack of professionalism.

183.    No substantial issues were discovered by the outside investigator, Attorney Patricia Holland.

184. On information and belief, these "anonymous" allegations were manufactured and falsely contrived by ARPM Tammy Bishop under the guidance and/or in coordination with Dr. Andrew Muir.

### Attacks on Plaintiff's Research Staff

185. On information and belief, over the course of the past year and a half, Dr. Muir has met and worked closely with Assistant Research Practice Manager Tammy Bishop. These meetings about Plaintiff took place despite the fact that Bishop is supposed to report to the Clinical Research Organization management, and not to Dr. Muir.

186. On information and belief, after speaking with Muir, ARPM Bishop met with Plaintiff's staff privately and encouraged them to provide her with negative information about Plaintiff.

187. Two employees who were outspoken supporters of Plaintiff (Christopher Kigongo and Kayotta Johnson) refused to provide any negative information about Plaintiff to ARPM Bishop. Both were then disciplined by ARPM Bishop.

188. In February/March 2018, ARPM Bishop gave a poor performance review and Performance Improvement Plan (PIP) to Plaintiff's longtime Research Manager, Christopher Kigongo (black male, Ugandan origin). This performance review and PIP were not justified.

189. Because of Mr. Kigongo's unfair treatment, he himself filed two Charges of Discrimination with Equal Employment Opportunity Commission alleging race/national origin discrimination and retaliation. These charges are still pending.

190. ARPM Bishop also acted against Plaintiff's new administrative assistant, Kayotta Johnson (African-American female).

191. In June 2018, ARPM Bishop falsely accused Johnson of "falsifying a time card" and occasioned yet another investigation of Plaintiff's area based on this bogus allegation.

192.   Ms. Johnson refused to sign a written warning from ARPM Bishop and instead noted that ARPM Bishop had been attempting to gather negative information about Plaintiff and that she had refused to cooperate.

## Dr. Muir Denies Plaintiff Earned Clinical Incentives

193.   Plaintiff earns financial incentives for clinical work that she performs, i.e. for treatment of patients.

194.   Financial incentives are paid for physicians who perform a specified number of patient encounters, measured by "relative value units" or "RVU's."

195.   Plaintiff significantly exceeded her RVU benchmarks for receiving incentive pay for 2016/2017 academic year.  She therefore earned her clinical incentives in that year.

196.   Nevertheless, in October 2017, Dr. Muir refused to pay Plaintiff the money she had earned as clinical incentive payments.

197.   Since that time Dr. Muir has cut Plaintiff's ability to do clinical work and earn additional clinical incentive payments.

198.   But for the unlawful actions of Defendant, Plaintiff would have been able to earn her clinical incentive payments up to the present.

199.   Plaintiff last received the clinical incentive payments for her work in the 2015/2016 academic year.  She was paid $14,431 for that year.

200.   Because of the unlawful behavior of Defendant, Plaintiff has lost clinical incentive payments of approximately $43,293 for the subsequent three academic years.

201.   Upon information and belief, during the past three years, males in the GI Division have not been denied proper payment of earned clinical incentives or denied the right to do clinical work and thereby earn clinical incentive payments.

202.    Upon information and belief, during the past three years, white physicians in the GI Division have not been denied proper payment of earned clinical incentives or denied the right to do clinical work and thereby earn clinical incentive payments.

203.    Upon information and belief, during the past three years, US origin physicians in the GI Division have not been denied proper payment of earned clinical incentives or denied the right to do clinical work and thereby earn clinical incentive payments.

## **Dr. Muir Denies Plaintiff Her Financial Research Incentives**

204.    Plaintiff performs academic research in the GI Division and the Duke Clinical Research Institute (DCRI), both of which are overseen by Dr. Muir.

205.    If she meets certain benchmark measures for her research, she is supposed to receive financial research incentives.

206.    One of these incentives is for work at the DCRI.  Plaintiff completed the work necessary to obtain a research incentive payment of $1,981 for DCRI study #5693 Nash Liver Fibrosis With Cirrhosis.

207.    The second of these incentives is governed by the Research Incentive Plan adopted by the Department of Medicine.

208.    Under the Research Incentive Plans adopted for academic years 2016-2017, 2017-2018 and 2018-19, Plaintiff has earned research incentives of approximately $20,000 per year or approximately $60,000 total.

209.    Despite Plaintiff earning these two types of research incentive payments, Dr. Muir has refused to pay them.

210.    On information and belief, such payments have not been denied to comparable male researchers in the GI Division.

27

211.    On information and belief, such payments have not been denied to comparable white researchers or researchers with a U.S. national origin in the GI Division.

212.    Up to the present, Plaintiff is being wrongfully denied financial research incentives on an ongoing basis by Dr. Muir.

## Dr. Muir Denies Plaintiff Proper Administrative Assistance

213.    Plaintiff runs one of the largest academic site-based clinical research programs at Defendant, with millions of dollars in grant money.

214.    Plaintiff is also active in multiple professional organizations and both produces and reviews numerous academic medical papers each year.

215.    When Plaintiff's administrative assistant left in 2017, Dr. Muir refused to allow Plaintiff to hire another assistant, requiring Plaintiff to perform her own secretarial work and scheduling for almost an entire year.

216.    No comparable male doctor has been denied administrative assistance by Dr. Muir.

217.    No comparable white doctor has been denied administrative assistance by Dr. Muir.

218.    No comparable doctor of U.S.-origin has been denied administrative assistance by Dr. Muir.

## Dr. Muir Denies Plaintiff Proper Clinical Assistance

219.    Plaintiff works as a physician treating patients in the Gastroenterology Clinics at Duke University Medical Center.

220.    A physician's assistant who worked with Plaintiff left the program in 2017.

221.    Plaintiff repeatedly asked Dr. Muir for permission to hire a physician's assistant or other mid-level provider to replace him, but Dr. Muir has refused to allow her to do so.

222. Physicians in the GI Division are often provided with doctors or graduate students on fellowships to assist with their work.

223. Dr. Muir did not provide Plaintiff a fellow-trainee to support her clinics and off-set the clinical burden of seeing patients, documenting encounters or performing the necessary post-clinic follow-up communications.

224. Because NAFLD is the leading cause of chronic liver disease in the United States, it is perplexing that no fellow-trainee was given the work-study experience of learning about this disease from a leading expert.

225. No comparable male doctor was denied a physician assistant, mid-level provider or fellow-trainee by Dr. Muir.

226. No comparable white doctor was denied a physician's assistant, mid-level provider or fellow-trainee by Dr. Muir.

227. No comparable doctor of U.S.-origin was denied a physician assistant, mid-provider or fellow-trainee by Dr. Muir.

### Dr. Muir Cuts Plaintiff's On-Call Assignments

228. Plaintiff performs call duty, acting as a doctor at various locations owned by Defendant, including Duke Regional Hospital and Duke Raleigh Hospital.

229. Dr. Muir prohibited Plaintiff from performing this call duty.

230. As a result, Plaintiff has lost supplemental income and has had her credentials to practice at Duke Raleigh Hospital revoked due to lack of patient contact in the past 2 years.

231. No comparable male doctor was denied call duty or equal opportunity for supplemental income by Dr. Muir.

232. No comparable white doctor was denied call duty or equal for supplemental income by Dr. Muir.

233. No comparable doctor of U.S.-origin was denied call duty or equal for supplemental income by Dr. Muir.

234. Up to the present, Plaintiff has lost approximately $40,000/year for the past 2 years because of the denial of call duty.

### Dr. Muir Places Plaintiff on Unjustified Performance Improvement Plans

235. In September 2017, Dr. Muir, in coordination with Dean Klotman, placed Plaintiff on an unjustified Performance Improvement Plan ("PIP").

236. The following year, despite Plaintiff's good performance and completion of all the material aspects of the PIP, Dr. Muir, with the approval of Dean Klotman and Dr. Joseph Rogers, Interim Chair for the Department of Medicine, renewed the plan for the current year.

237. As of the date of this Complaint, Plaintiff remains on the PIP.

238. There was no substantial justification for placing Plaintiff on either PIP.

239. With the exception of Plaintiff having filed three separate EEOC Charges of Discrimination starting in November, 2017, there was no reason for the continuation of the original PIP.

240. No comparable male doctor has been placed on a Performance Improvement Plan in similar circumstances.

241. No comparable white doctor has been placed on a Performance Improvement Plan in similar circumstances.

242. No comparable doctor of U.S.-origin has been placed on a Performance Improvement Plan in similar circumstances.

<u>**Damages From Discrimination and Retaliation**</u>

243.    Defendant has discriminated against Plaintiff on the basis of her race and/or national origin.

244.    Defendant has discriminated against Plaintiff on the basis of her gender.

245.    Defendant has retaliated against Plaintiff because of her opposition to race and/or national origin discrimination.

246.    Defendant has retaliated against Plaintiff because of her opposition to gender discrimination.

247.    As a result of Defendant's unlawful actions, Plaintiff has suffered lost wages, lost benefits, lost leadership opportunities, emotional distress and other compensatory damages.

<u>**FIRST CAUSE OF ACTION:**</u>
<u>**SEXUAL, RACIAL AND/OR NATIONAL ORIGIN DISCRIMINATION**</u>
<u>**IN VIOLATION OF TITLE VII OF THE 1964 CIVIL RIGHTS ACT**</u>

248.    Plaintiff hereby incorporates by reference the allegations of the above factual allegations in support of this claim for relief.

249.    The actions of Defendant as set forth herein constitute intentional discrimination against Plaintiff on the basis of her sex, race and/or national origin in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981A(a)(1).

250.    Defendant engaged in discriminatory practices against Plaintiff with either malice or reckless indifference to the federally protected rights of Plaintiff to be free from sexual, racial and/or national origin discrimination in the workplace, as set forth in 42 U.S.C. § 1981A(b)(1).

251.    As a result of the unlawful actions of Defendant as set forth herein, Plaintiff has suffered the loss of wages, other financial compensation and benefits of employment.

252.    Plaintiff is entitled to recover for economic losses in an amount greater than $25,000.

253.    As a result of the unlawful actions of Defendant as set forth herein, Plaintiff has suffered compensatory damages including loss of enjoyment of life, inconvenience, mental suffering, and emotional distress.

254.    Plaintiff is entitled to recover compensatory damages as provided by the 1964 Civil Rights Act, 42 U.S.C. § 2000e, *et seq.* (Title VII) in an amount exceeding $25,000 as a proximate result of Defendant's conduct alleged herein.

255.    Plaintiff is entitled to punitive damages as provided by the Civil Rights Act of 1991, 42 U.S.C. § 1981(a)(1) and (b)(1) in an amount exceeding $25,000 as a proximate result of Defendant's conduct alleged herein.

256.    Plaintiff is entitled to her costs and reasonable attorney's fees incurred for asserting her rights under federal law as set forth in 42 U.S.C. § 2000e-5(k).

## SECOND CAUSE OF ACTION: RETALIATION IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1964

257.    Plaintiff hereby incorporates by reference the above factual allegations in support of this claim for relief.

258.    As set forth above, Plaintiff objected to discrimination against her on the basis of her gender, race and national origin in direct conversations with Dr. Muir.

259.    Plaintiff filed three separate Charges of Discrimination against Defendant on the basis of these protected characteristics.

260.    The actions of Defendant as set forth herein constitute retaliation against Plaintiff for the assertion of her right to be free from sexual, racial and/or national origin discrimination.  Such retaliation is in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e-3(a).

261.    As a result of the unlawful actions of Defendant as set forth herein, Plaintiff has suffered the loss of wages, other compensation, and benefits of employment.

262.    Plaintiff is entitled to recover for economic losses in an amount greater than $25,000.

263.    As a result of the unlawful actions of Defendant as set forth herein, Plaintiff has suffered compensatory damages including loss of enjoyment of life, inconvenience, mental suffering, and emotional distress.

264.    Plaintiff is entitled to recover compensatory damages as provided by the 1964 Civil Rights Act, 42 U.S.C. § 2000e, *et seq.* (Title VII) in an amount exceeding $25,000 as a proximate result of Defendant's conduct alleged herein.

265.    Defendant engaged in retaliation against Plaintiff with either malice or with reckless indifference to the federally protected rights of Plaintiff to be free from racial and national origin discrimination in the workplace, as set forth in 42 U.S.C. § 1981A(b)(1).

266.    Plaintiff is entitled to punitive damages as provided by 42 U.S.C. § 1981 in an amount exceeding $25,000 as a proximate result of Defendant's conduct as alleged herein.

267.    Plaintiff is entitled to her costs and reasonable attorney's fees incurred for asserting her rights under federal law as set forth in 42 U.S.C. § 2000e-5(k).

### THIRD CAUSE OF ACTION:
### VIOLATION OF THE RECONSTRUCTION ERA STATUTES

268.    Plaintiff hereby realleges and incorporates by reference the factual allegations above as though set forth fully herein.

269.    The actions of Defendant as set forth herein constitute intentional discrimination and retaliation on the basis of Plaintiff's race in violation of the Reconstruction Era Statutes, 42 U.S.C. § 1981.

270. As a result of the unlawful actions of Defendant as set forth herein, Plaintiff has suffered the loss of wages, other forms of compensation and benefits of employment.

271. Plaintiff is entitled to recover her economic losses in an amount greater than $25,000.

272. As a result of the unlawful actions of Defendant as set forth herein, Plaintiff has suffered compensatory damages including loss of enjoyment of life, inconvenience, mental suffering, and emotional distress.

273. Plaintiff is entitled to compensatory damages as provided by the Reconstruction Era Statutes, 42 U.S.C. § 1981, in an amount exceeding $25,000 as a proximate result of Defendant's conduct alleged herein.

274. Defendant engaged in race discrimination and retaliation against Plaintiff with either malice or with reckless indifference to the federally protected rights of Plaintiff to be free from race discrimination in the workplace.

275. Plaintiff is entitled to punitive damages in an amount exceeding $25,000 as a proximate result of Defendants' conduct as alleged herein.

276. Plaintiff is entitled to her costs and reasonable attorney's fees incurred for asserting her rights under federal law as set forth in 42 U.S.C. § 2000e-5(k).

## FOURTH CAUSE OF ACTION:
## VIOLATION OF THE EQUAL PAY ACT

277. Plaintiff hereby incorporates by reference the above factual allegations in support of this claim for relief.

278. Defendant sells and licenses products, charges for the education of students from throughout the United States and numerous foreign countries, and treats patients from throughout the United States and numerous foreign countries thereby acting as an enterprise engaging in

commerce within the meaning of the Fair Labor Standards Act of 1938 and the Equal Pay Act, 29 U.S.C. §§ 206, 203(e)(r), and (s).

279.     Plaintiff is a female researcher and physician employed by Defendant in the Division of Gastroenterology, Department of Medicine.

280.     Plaintiff is a Full Professor.

281.     Defendant has unlawfully discriminated against Plaintiff because of her sex by paying wages to the Plaintiff at rates less than the rates at which pays wages to male employees in the G.I. Division for equal work on jobs, the performance of which require equal skill, effort and responsibility and which are performed under similar working conditions.

282.     Defendant's actions are a violation of the Equal Pay Act, 29 U.S.C. § 206(d)(1).

283.     Defendant has engaged in the discriminatory payment of wages based upon sex as set forth herein during the period since July 3, 2016.

284.     Defendant has refused to provide Plaintiff with specific information regarding the amount of the wages paid to male Full Professors.

285.     Plaintiff is informed and believes the median base compensation for a Full Professor in the Duke G.I. Division in 2017 was at least $329,025 while her compensation was $307,500. Plaintiff therefore alleges that she has been denied proper compensation of at least $20,000 per year.

286.     Defendant has repeatedly and willfully violated the Equal Pay Act by discriminating between employees on the basis of sex as set forth above.

287.     Plaintiff seeks an order that the Defendant pay to Plaintiff an amount equal to the difference between the wages she actually received and the wages paid to male employees performing equal work within the meaning of §6(d) of the Equal Pay Act with interest thereon.

35

288.    Plaintiff also seeks liquidated damages as allowed by the Equal Pay Act.

289.    Plaintiff also seeks an order that Defendant pay her costs and reasonable attorney's fees.

<u>**FIFTH CAUSE OF ACTION:**</u>
<u>**VIOLATION OF THE NORTH CAROLINA WAGE AND HOUR ACT**</u>

290.    Plaintiff hereby incorporates by reference the above factual allegations in support of this claim for relief.

291.    Defendant has failed to pay Plaintiff for wages earned within the meaning of the North Carolina Wage and Hour Act.

292.    Defendant has specifically refused to pay $1,981 for earned research incentives for DCRI study #5693 NASH Liver Fibrosis Without Cirrhosis.

293.    Defendant has also refused to pay approximately $60,000 for Department of Medicine Research Incentive payments Plaintiff has earned based upon the Department of Medicine Research Incentive Plan.

294.    Defendant has also refused to pay approximately $43,293 for Clinical Incentive Payments earned by Plaintiff.

295.    All of these incentive payments constitute "wages" under the terms of the NC Wage and Hour Act.

296.    Defendant's failure to pay Plaintiff wages earned as described herein constitutes a violation of N.C. Gen. Stat. § 95-25.6.

297.    Defendant's actions were willful and not based on any good faith belief of compliance with the law.

298.    Plaintiff is entitled to recover for back wages plus interest, liquidated damages, cost, and attorney's fees as provided by N.C. Gen. Stat. § 95-25.22.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays of the Court for the following relief:

1. That all issues of fact raised herein be tried by jury.

2. That the Court declare that the actions undertaken by Defendant as set forth above were unlawful and issue an order prohibiting Defendant from engaging in such actions in the future.

3. That the Court award Plaintiff more than $25,000 from Defendant in lost wages and other benefits of employment for the violation of Title VII, the exact amount to be determined at the trial of this action.

4. That the Court award Plaintiff more than $25,000 from Defendant in compensatory damages for the violation of Title VII, the exact amount to be determined at the trial of this action.

5. That the Court award Plaintiff more than $25,000 from Defendant in punitive damages for sex discrimination for violation of Title VII of the 1964 Civil Rights Act, the exact amount to be determined at the trial of this action.

6. That the Court award Plaintiff more than $25,000 from Defendant in punitive damages for race/national origin discrimination for violation of Title VII of the 1964 Civil Rights Act, the exact amount to be determined at the trial of this action.

7. That the Court award Plaintiff more than $25,000 from Defendant in lost wages and other benefits of employment for race discrimination in violation of the Reconstruction Era Statutes, the exact amount to be determined at the trial of this matter.

8. That the Court award Plaintiff more than $25,000 from Defendant in punitive damages for violation of the Reconstruction Era Statutes, the exact amount to be determined at the trial of this action.

9. That the Court award Plaintiff more than $25,000 for violation of the Equal Pay Act, the exact amount to be determined at the trial of this matter.

10. That the Court award Plaintiff more than $25,000 from Defendant in liquidated damages for violation of the Equal Pay Act, the exact amount to be determined at the trial of the action.

11. That the Court award Plaintiff more than $25,000 from Defendant for violation of the NC Wage and Hour Act, the exact amount to be determined at the trial of this matter.

12. That the Court award Plaintiff more than $25,000 in liquidated damages for the violation of the NC Wage and Hour Act, the exact amount to be determined at the trial of this action.

13. That the Court award Plaintiff attorneys' fees pursuant to N.C.G.S § 95-25.22(d), 29 U.S.C. 216(b, and/or 42 U.S.C. § 2000e-5(k).

14. That the Court award the costs incurred by Plaintiff in connection with prosecution of this action.

15. That the Court award Plaintiff all interest allowed by law.

16. For such other and further relief as the Court may deem just and proper.

This is the 3rd day of July, 2019.

GLENN, MILLS, FISHER & MAHONEY, P.A.


/s/ Stewart W. Fisher
Stewart W. Fisher (NC Bar #10327)
Post Office Drawer 3865
Durham, North Carolina 27702-3865
Telephone: (919) 683-2135
Facsimile: (919) 688-9339
sfisher@gmfm-law.com

ATTORNEYS FOR PLAINTIFF