# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

### CIVIL ACTION NO. 1:19-cv-00664-CCE-LPA

| | | |
|---|---|---|
| **MANAL ABDELMALEK** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **CHRISTOPHER KIGONGO,** | ) | **SECOND AMENDED COMPLAINT** |
| | ) | **(Jury Trial Demanded)** |
| **Plaintiffs,** | ) | |
| v. | ) | |
| | ) | |
| **DUKE UNIVERSITY** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

Now comes Plaintiffs, complaining of Defendant, and allege as follows:

## INTRODUCTION

### Plaintiff Manal Abdelmalek

1.      Plaintiff Manal Abdelmalek is a tenured Full Professor and physician working in the Division of Gastroenterology ("GI Division") within the Department of Medicine at Duke University Medical Center.

2.      Plaintiff Abdelmalek is one of the world's leading experts on non-alcoholic fatty liver disease ("NAFLD") and has brought in research grants totaling more than $10 million dollars to Defendant.

3.      Plaintiff Abdelmalek is an Egyptian female who immigrated to this country as a young child with her family to escape religious persecution.  She is a naturalized citizen of the United States.

4.     Plaintiff Abdelmalek has been subjected to discrimination on the basis of her gender and her race/national origin ("ethnic discrimination") by Defendant.

5.     Plaintiff Abdelmalek has objected to this unlawful discrimination by Defendant on numerous occasions and has filed three separate Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC").

6.     As a result of her objections to gender and ethnic discrimination, Plaintiff Abdelmalek has suffered retaliation by Defendant.

7.     Defendant's discrimination and retaliation against Plaintiff Abdelmalek has included a pattern of  adverse actions against her as follows:

- Delaying her promotion to full professor

- Denying her proper and equitable salary

- Denying her earned financial research incentives

- Denying her earned clinical performance incentives

- Denying her the appropriate staffing for her clinical practice

- Subjecting her to unjustified disciplinary measures including performance improvement plans founded on hearsay and anonymous complaints

- Threatening to discharge her

- Subjecting her to unwarranted investigations and audits based upon anonymous complaints

- Falsely accusing two of her ethnic minority staff members of improper conduct and performance

8.     Plaintiff Abdelmalek's claims for race/national origin discrimination and retaliation are brought under Title VII of the Civil Rights Act of 1964 ("Title VII") as amended by the Civil

2

Rights Act of 1991 and set forth in 42 U.S.C. § 2000e, *et seq.* and under 42 U.S.C. § 1981 ("Reconstruction Era Statutes").

9. Plaintiff Abdelmalek's claims of gender discrimination are brought under Title VII and the Equal Pay Act of 1963, 29 U.S.C. § 206(d)(1) *et seq.*

10. Plaintiff Abdelmalek also makes claims under the N. C. Wage and Hour Act, N.C. Gen. Stat. § 95-25.1 *et seq.*, for failure to pay financial incentives and other compensation due to her.

11. Plaintiff Abdelmalek seeks injunctive relief, monetary relief, compensatory damages, liquidated damages, punitive damages, and attorney's fees pursuant to 42 U.S.C. § 2000e(g), 29 U.S.C. § 216(b), N.C. Gen. Stat. § 95-25.22, and 42 U.S.C. §1981A(b).

## Plaintiff Christopher Kigongo

12. Plaintiff Kigongo is Senior Clinical Research Coordinator working for Defendant Duke in the GI Division of the Department of Medicine.

13. Plaintiff Kigongo has worked at Defendant for more than thirteen years. For the past nine years he has worked in the research program on NAFLD with Plaintiff Abdelmalek. He is currently a Sr. Clinical Research Coordinator at Defendant.

14. Plaintiff Kigongo is a black male and a native of Uganda. He is a naturalized citizen of the United States.

15. Plaintiff Kigongo has been subjected to discrimination on the basis of his race/national origin ("ethnic discrimination") by Defendant.

16. Plaintiff Kigongo has objected to unlawful discrimination against Plaintiff Abdelmalek and participated in investigations of her claims of discrimination.

17. Plaintiff Kigongo has also objected to discrimination and retaliation against him by filing two separate Charges of Discrimination with the EEOC.

3

18.     As a result of his objections to gender and ethnic discrimination against Dr. Abdelmalek, his participation in investigations of Dr. Abdelmalek's discrimination claims, and his objection to ethnic discrimination against himself, Plaintiff Kigongo has suffered retaliation by Defendant.

19.     Defendant's discrimination and retaliation against Plaintiff Kigongo include a pattern of adverse actions against him as follows:

- Being falsely accused of violating Defendant's "Expectations of Conduct"

- Being placed on an unwarranted Performance Improvement Plan

- Being given a "Needs Improvement" rating on his annual evaluation

- Being denied annual merit increases in his salary.

## JURISDICTION AND VENUE

20.     The jurisdiction in this Court is invoked pursuant to 42 U.S.C. § 2000e, 42. U.S.C. § 1981, 38 U.S.C. § 4323(b)(2), 28 U.S.C. § 1337, and 28 U.S.C. § 1343(4).

21.     This Court should assume supplemental jurisdiction of Plaintiff Abdelmalek's state law claims for violation of the North Carolina Wage and Hour Act under 28 U.S.C. § 1367(b) because these claims are based upon the same operative facts as the federal claims over which the Court has jurisdiction, and judicial economy, convenience and fairness to the parties demand that the Court assume and exercise jurisdiction over all claims alleged herein.

22.     The venue of this Court over this controversy is based upon the following:

a.      The unlawful employment practices alleged herein were committed in the Middle District of North Carolina.  Accordingly, venue lies in the United States District Court for the Middle District of North Carolina under 28 U.S.C. § 1391(b); and,

b.      Plaintiff s aver that Defendant is a non-profit corporation doing business in this judicial district within the meaning of 28 U.S.C. § 1391(c).

4

## PARTIES

23.     Plaintiff Abdelmalek is a citizen and resident of Durham County, North Carolina.

24.     Plaintiff Kigongo is a citizen and resident of Orange County, North Carolina.

25.     Defendant Duke University ("Defendant" or "Duke") is a corporation existing under the laws of North Carolina and operating Duke University Medical Center and Duke University Medical School in Durham, NC.

26.     The following persons acted as the employees and agents of Defendant and within the course of scope of their agency with regard to all of the matters set forth in the Complaint:

- Dr. Mary Klotman (white female, U.S. national origin), former Chair of the Department of Medicine and currently Dean of the School of Medicine.

- Dr. Joseph Rogers (white male, U.S. national origin), Interim Chair of the Department of Medicine

- Dr. Ann Brown (white female, U.S. national origin), Assistant Dean of the School of Medicine

- Dr. Laura Svetkey (white female, U.S. national origin), Assistant Dean of the School of Medicine

- Dr. Andrew Muir (white male, Australian national origin), Chief of the Division of Gastroenterology, Department of Medicine

- James Nieman (white male, U.S. national origin), Human Resources Director, Department of Medicine

- Cathy O'Neill (white female, U.S. national origin), Business Manager, Division of Gastroenterology

5

- Tammy Bishop (white female, U.S. national origin), Assistant Research Practice Manager ("ARPM"), Department of Medicine, Clinical Research Unit

27.     All of the above-referenced employees and agents exercised management authority for Defendant with regard to Plaintiffs'employment.

28.     At all times relevant to this Complaint, Defendant employed more than 500 employees for each working day in each of the twenty or more calendar weeks in the current or preceding calendar year.

29.     At all times relevant to this Complaint, Defendant has been an employer of Plaintiff Abdelmalek under the provisions of the Fair Labor Standards Act, 29 U.S.C. 203(d), and thereby subject to the Equal Pay Act, 29 U.S.C. § 206(d)(1).

30.     At all times relevant to this Complaint, Defendant has been a "person" as defined in the North Carolina Wage and Hour Act, N. C. Gen. Stat. 95-25.2 (11).

<b><u>EXHAUSTION OF ADMINISTRATIVE REMEDIES</u></b>

31.     Plaintiff Abdelmalek timely filed three separate Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), designated as EEOC Charge Nos. 433-2018-00498, 433-2018-02172, and 433-2018-03468.

32.     On or about April 22, 2019, the EEOC issued Notices of Right to Sue to Plaintiff Abdelmalek with regard to each of these Charges of Discrimination.

33.     Plaintiff Abdelmalek has exhausted all of her administrative remedies under Title VII of the 1964 Civil Rights Act.

34.     Plaintiff Kigongo timely filed two separate Charges of Discrimination with the EEOC, designated as EEOC Charge Nos. 433-2018-02629 and 433-2018-03208.

35.     On or about July 26, 2019, the EEOC issued Notices of Right to Sue to Plaintiff Kigongo with regard to each of these Charges of Discrimination.

36.     Plaintiff Kigongo has exhausted all of his administrative remedies under Title VII of the 1964 Civil Rights Act.

## STATEMENT OF FACTS

### Plaintiff Abdelmalek's Background

37.     Plaintiff Abdelmalek was born in 1968 in Cairo, Egypt.

38.     Plaintiff Abdelmalek is a married female with two children.

39.     All of the employees and agents of Defendant identified above knew Plaintiff Abdelmalek is female.

40.     Plaintiff Abdelmalek has olive-colored skin and a broad nose, giving her a non-white appearance.

41.     Because of her physical characteristics, Plaintiff Abdelmalek is often asked where she is from and whether she is African-American or Hispanic.

42.     Plaintiff Abdelmalek is proud of her Egyptian heritage and tells people that she is Egyptian.

43.     All of the employees and agents of Defendant listed above were aware that Plaintiff Abdelmalek is a non-white Egyptian.

44.      Plaintiff Abdelmalek is a Coptic Christian, part of a religious minority that was persecuted by Muslim authorities in Egypt.

45.     Because of religious persecution, Plaintiff Abdelmalek's family immigrated to the United States when she was five years old and she was raised in St. Louis, Missouri.  Plaintiff Abdelmalek is a naturalized United States citizen.

7

46. Plaintiff Abdelmalek graduated from a combined BA-MD 6-year program at the School of Medicine at the University of Missouri—Kansas City in 1992.

47. Plaintiff Abdelmalek did a residency in Internal Medicine at the Mayo Clinic in Rochester, Minnesota and fellowship in Gastroenterology and Hepatology at Mayo Clinic sites in Rochester and Scottsdale, Arizona in 1998.

48. Plaintiff Abdelmalek obtained a Master's degree in Public Health with a Concentration in Epidemiology from the University of Florida in 2004.

49. Plaintiff Abdelmalek is board-certified by the American Board of Medicine as a Diplomate in three separate specialties: Internal Medicine, Gastroenterology, and Hepatology.

50. From August 1998 until March 2006, Plaintiff Abdelmalek was employed by the University of Florida, College of Medicine, Gainesville, Florida, as a physician and professor. Her final position there was as an Associate Professor with tenure.

51. In March 2006, Plaintiff Abdelmalek was recruited to come to Defendant by the former Chief of the GI Division, Dr. Anna Mae Diehl (white female, US national origin).

52. As one of the world's leading experts on non-alcoholic fatty liver disease, Plaintiff Abdelmalek has published more than a hundred academic papers in medical journals about research on the disease.

53. Plaintiff Abdelmalek serves as a reviewer and referee for more than twenty learned medical journals and is regularly invited to national and international conferences to speak about liver disease.

54. In addition to her research, Plaintiff Abdelmalek has a very busy clinical practice at Duke, treating patients with liver disease and other gastroenterological conditions.

55.     With over 20 years in clinical practice, to the best of her knowledge, Plaintiff
Abdelmalek has never had a malpractice claim made against her.

56.     Plaintiff Abdelmalek is consistently given high ratings by her patients for her care of
them.

57.     Plaintiff Abdelmalek has won three different Patient Choice Awards during her time at
Duke.

58.     Plaintiff Abdelmalek has served as an informal mentor for residents, fellows and graduate
students at Duke.

59.     Although she had been tenured at the University of Florida, Plaintiff Abdelmalek joined
Duke as a tenure-seeking Associate Professor in 2006.

### Plaintiff Kigongo's Background

60.     Plaintiff Kigongo was born in Uganda in 1960.

61.     In December 2008, Plaintiff Kigongo became a naturalized citizen of the United States.

62.     Plaintiff Kigongo is a black male.

63.     Plaintiff Kigongo is married and has five children.  Four of them have already graduated
from college and the youngest is currently in college.

64.     Plaintiff Kigongo was trained in medicine at Makerere University Medical School in
Kampala, Uganda.  He received a medical license in Uganda in 1986.

65.     In 1991, Plaintiff Kigongo came to the United States to receive additional education and
obtained a Master's Degree in Public Health from the University of North Carolina at Chapel
Hill in 1993, after which he returned to Uganda.

66.     Plaintiff Kigongo worked for approximately thirteen years as a medical officer/senior
medical officer for the Ministry of Health in Uganda. He also worked part time with the United

Nations (UNICEF), the World Health Organization, and various non-governmental agencies in his native country while working for the Ministry of Health. His work included maternal and pediatric health, malaria, and HIV/AIDS issues.

67.     Plaintiff Kigongo returned to the United States and he worked as an investigator for the Institute of Health, Social, and Community Research at Shaw University, and a research assistant for the Department of Epidemioloy for UNC's School of Public Health, and as an HIV/ADIS clinical specialist for IntraHealth Inernational.

68.     Plaintiff began working at Defendant Duke in 2005, initially as a Clinical Research Coordinator in the Department of Anesthesiology.

69.     In July 2010, Plaintiff Kigongo began work in the GI Division with Defendant's Department of Medicine on the NAFLD research program under the supervision of Plaintiff Abdelmalek.

70.     In August 2015, Plaintiff Kigongo was promoted to the position Senior Clinical Research Coordinator.  In this position he has managed the staff  of the NAFLD research program.

71.     Plaintiff Kigongo's efforts have been critical to the success of Plaintiff Abdelmalek's research program.

72.     Prior to the events described below, when Plaintiff Abdelmalek began to object to her own unfair and discriminatory treatment by Defendant, Plaintiff Kigongo had never received an unsatisfactory annual performance evaluation from Defendant.

### Duke's Discriminatory Culture

73.     On information and belief, Defendant's Medical Center has a history of favoring men over women for promotion and compensation.

10

74.     On information and belief, Defendant's Medical Center has a pattern and practice of paying male employees more than female employees who have equal or better training, experience and performance.

75.     On information and belief, Defendant's Medical Center has a pattern and practice of paying white employees more than non-white employees who have equal or better training, experience and performance.

76.     On information and belief, Defendant's Medical Center has a pattern of practice of disciplining ethnic minority (non-white, non-US origin) employees more harshly than white and/or US origin employees.

77.     On information and belief, Defendant's Medical Center has a pattern and practice of favoring and more readily promoting men over women.

78.     On information and belief, Defendant's Medical Center has a pattern and practice of selecting physicians for leadership positions without advertisement or open talent search, thereby denying ethnic minority women of equal or more experience or accomplishment the opportunity to assume leadership positions.

79.     Duke University Medical Center has a policy and procedure for granting tenure to the physicians who work there.

80.     The tenure policy requires physicians to submit a dossier detailing the academic and clinical accomplishments of the applicants for tenure.

81.     A tenure and promotion committee compares the qualifications and accomplishments of the applicants for tenure and makes a decision as to whether tenure should be granted.

82.     Physicians who receive promotion are given the rank of Associate Professor and, after a subsequent review, Full Professor. Tenure and promotion to Full Professor are awarded to those with outstanding academic accomplishment.

83.     Those granted promotion to rank of Full Professor have equivalent qualifications and accomplishments under Defendant's tenure policy.

84.     The American Association of Medical Colleges (AAMC) compiles statistics showing the percentages of men and women who have been promoted to Full Professor on medical school faculties throughout the United States and their salaries.

85.     For both 2014 and 2015, all of the other medical schools in North Carolina supplied this data to the AAMC.   Duke refused to do so.

86.     On information and belief, Duke continues to refuse the AAMC such data for the years since 2015.

## Salary Equity Data from the GI Division

87.     After Plaintiff Abdelmalek filed her original Charge of Discrimination against Duke on November 13, 2017, Defendant undertook an examination of gender equity for salaries within the GI Division.

88.     On November 28, 2017, GI Division Chair Muir did a presentation of the salary equity data for the GI Division.

89.     Muir's presentation showed that within the GI Division, women are being paid less than men who share the same faculty rank.

90.     Muir's presentation showed that women performing the same jobs as men in the GI Division are paid at least 10% less than the men.

12

91.     Muir's presentation showed that in 2017, the GI department had 3 women and 6 men who were Full Professors.

92.     Plaintiff Abdelmalek is informed and believes that the Full Professors in the GI Division with non-VA appointments included in the presentation were follows:

- Dr. Andrew Muir (white male, Australian national origin)

- Dr. Martin Henry Poleski (white male, Canadian national origin)

- Dr. Carl Berg (white male, US national origin)

- Dr. Malcolm Stanley Branch (white male, US national origin)

- Dr. Paul Simon Jowell (white male, South African national origin)

- Dr. Mahfuzul Haque (South Asian male, Bangladesh national origin)

- Dr. Anna Mae Diehl (white female, US national origin)

- Dr. Joanne A. Peebles Wilson (black female, US national origin)

- Dr. Manal Abdelmalek (Non-white female, Egyptian national origin)[1]

93.     Like all of the physicians in the GI Division, Plaintiff Abdelmalek does clinical work, treating patients with gastrointestinal disease.

94.     Plaintiff Abdelmalek performs work of equal skill, effort and responsibility and under similar working conditions as the men in the GI Division, including the men who are classified as Full Professors.

---

[1] Dr. Muir's presentation showed only 6 male Full Professors and 3 females. Even though Dr. Rodger A. Liddle (white male, US national origin) and Dr. Dawn T. Provenzale (white female, US national origin) are also ranked as Full Professors in the GI Division, Plaintiff Abdelmalek believes they were not part of Muir's presentation because they work full-time at the Durham Veterans Administration Medical Center.

13

95. Plaintiff Abdelmalek's qualifications, experience, work duties and responsibilities are substantially similar to each of the physicians identified above as Full Professors and her performance has been equal to or better than theirs.

96. On information and belief, Plaintiff Abdelmalek has been paid and continues to be paid less than each of the men who are Full Professors in the Division of Gastroenterology.

97. In his presentation of salary equity data, GI Division Chair Muir failed to provide sufficient data to allow a comparison of particular males in the GI division to particular females, but he did state that women are generally being paid at least 10% less than men.

98. GI Division Chair Muir provided no data sorted by ethnicity, so that Plaintiff Abdelmalek was unable to compare herself to her specific counterparts in the GI Division by race or national origin.

99. The presentation showed that according to AAMC data for 2016, the median base compensation for a Full Professor in programs comparable to the Duke GI Division was $329,025 dollars.

100. The presentation showed that according AAMC data for 2016, the median total compensation for a Full Professor in programs comparable to the Duke GI Division was $423,325 dollars.

101. Plaintiff Abdelmalek is informed and believes that the male Full Professors were being paid more than these median amounts in 2017 and continue to be paid more these median amounts.

102. Plaintiff Abdelmalek was being paid less than these median amounts in 2017 and continues to be paid less.

14

103.     Plaintiff Abdelmalek is informed and believes that Dr. Joanne A. Peebles Wilson, a black female, is the lowest paid Full Professor in the Division.

104.     On multiple occasions since she filed her first Charge of Discrimination, Plaintiff Abdelmalek has requested that the GI Division Business Manager, Cathy O'Neill, provide her with the salary equity data for the Division so that she can specifically compare her salary to that of the others in the Division.

105.     GI Division Chair Muir has instructed Business Manager O'Neill not to provide the data.

106.     Plaintiff Abdelmalek also requested similar salary equity data from School of Medicine Vice Dean for Finance, Mr. Billy Newton.

107.     All of her requests for salary equity data have been rejected, both at the level of the Division and the School of Medicine.

108.     On information and belief, female doctors in the GI Division are paid less than comparable men.

109.      On information and belief, non-white doctors in the GI Division are paid less than comparable white doctors.

110.     On information and belief, non-U.S. origin doctors in the GI Division are paid less than comparable U.S. origin doctors.

111.     Although Dr. Muir said during his oral presentation that he was going to establish a committee to examine salary equity data in the GI Division, that committee has failed to provide any type of written report that would allow a specific comparison of male/female salaries or salaries broken down by racial or national origin category.

## Dr. Andrew Muir

112.     When Plaintiff Abdelmalek came to Duke, Dr. Andrew Muir was another physician practicing within the GI Division who also specialized in liver disease.

113.     Dr. Muir attended Duke University as an undergraduate, went on to Duke University Medical School and did his residency at Duke in internal medicine and gastroenterology, serving as the Chief Resident.

114.     Dr. Muir was born in Australia and became a U.S. citizen in 2010.

115.     Because of his long association with Duke, Dr. Muir has fully absorbed, endorsed and adopted the culture and employment practices of Duke, including the long-standing practice of favoring men over women and favoring employees whose national origin is the US over those who are from foreign countries.

116.     For most of his career, Dr. Muir has favored men over women and US origin employees over non-US origin.

117.     When Dr. Muir has hired physicians who are not from the US or who are non-white, he has kept them in subordinate positions and used them to support his own work, rather than supporting their career advancement.

118.      In general, Dr. Muir has failed to promote the careers of women and non-U.S. origin employees beyond the associate professor level.

119.     Under Dr. Muir, the following female and non-U.S. origin employees left the GI Division:

- Keyur Patel, MD (South Asian male, Indian-Australian origin)—tenured Associate Professor

- Hans Tillman, MD (white male, German origin)—Associate Professor

16

- Alastair Smith, MD (white male, Scottish origin)—Associate Professor

- Ayako Suzuki, MD, PhD (Asian female, Japanese origin)—Assistant Professor (who eventually returned)

- Iliana Bouneva, MD (white female, Bulgarian origin)—Associate Professor

120.    By contrast, Dr. Muir has been instrumental in promoting and supporting the following employees:

- Stan Malcolm Branch (white male, US origin)

- Paul Simon Jowell (white male, South African origin)

- Ziad Gellad, (white male, US origin)

- Andrew Ira Wolf (white male, US origin)

- Debra Fisher (white female, US origin)

- Katie Garman (white female, US origin),

- Melissa Gail Teitelman-Grotegut (white female, US origin)

- Rebecca Ann Burbridge, MD (white female, US origin)

- Clara Brady (black female, US origin)

121.    During a conversation with Dr. Muir in Spring 2016, Plaintiff Abdelmalek expressed her concerns that she was being treated unfairly and misjudged by Duke leadership because of inherent bias toward minority women and how he had portrayed her to upper leadership.

122.    Dr. Muir said that Duke is a white male-dominated Southern institution with deep-rooted cultural norms.

123.    Dr. Muir also admitted that Duke has adopted cultural norms of the South which define how minorities and woman should behave.

17

124.    Dr. Muir specifically stated that the male leadership administering the clinical research programs were "sexist."

125.    Instead of pledging to help protect Plaintiff Abdelmalek and/or resist this culture, Dr. Muir recommended that Plaintiff Abdelmalek learn to adapt to it by learning "soft skills" and "how to navigate" the complex matrix of Duke.  He advised the Plaintiff Abdelmalek that if she could not adapt to the cultural norms of Duke, then she should leave.

126.    This advice was ironic, because in prior public interviews regarding his own success, Dr. Muir had stated "the key to having a successful research and clinical career at Duke: be assertive."

127.    Plaintiff Abdelmalek is an assertive person.  As a result of the persecution her family faced for their religion and culture, Plaintiff Abdelmalek was taught to stand up for what is right and denounce injustice.

128.    Dr. Muir did not and does not want Plaintiff Abdelmalek to be assertive.

129.    Dr. Muir expects Plaintiff Abdelmalek, as an ethnic minority female, to be passive and subservient.

130.    Dr. Muir has adopted a stereotypical discriminatory bias and attitude toward her that is inherent to the historical norms and culture of the Duke University and its leadership.

131.    Because Defendant has been unable to find any substantive fault with Plaintiff Abdelmalek's performance as a researcher or physician, Defendant has instead used the following methods to "justify" adverse employment actions against her:

- Implementing intensive investigations of her and her program based on anonymous allegations.

18

- Causing the repeated audit of her research program based on anonymous allegations.

- Accusing her of "unprofessional" conduct based on subjective criteria without conducting a thorough investigation or providing Plaintiff Abdelmalek the opportunity to question the alleged complainant.

- Bringing her before the Dean's Advisory Council for false reasons founded on anonymous allegations and hearsay paraphrasing another person (typically Dr. Muir).

- Encouraging clinical staff to make negative anonymous reports about Plaintiff Abdelmalek behind her back.

- Encouraging staff who manage clinical research to obtain negative information about Plaintiff Abdelmalek, even to the point where her staff felt harassed and pressured to comply with the request.

- Judging Plaintiff Abdelmalek's performance based on phony subjective criteria, not objective metrics of performance.

- Condoning, participating in, and/or encouraging sexist comments about body language, tone or demeanor, such Dr. Muir repeatedly telling Plaintiff Abdelmalek that he "does not like her body language."

132.    As set forth below, Dr. Muir and the Duke administration have used these methods to take a wide variety of adverse employment actions against Plaintiff Abdelmalek.

133.    Duke administrators, including Dr. Muir's adverse actions against Plaintiff Abdelmalek and have been ratified by Duke administrators including Department of Medicine Chair, now

Dean, Dr. Mary Klotman, Interim Department Chair Dr. Joe Rogers, Dr. Anne Brown, Dr. Laura Svetkey were aware of and ratified Dr. Muir's adverse actions against Plaintiff Abdelmalek.

134.    The adverse employment actions against Plaintiff Abdelmalek have been motivated by gender and ethnic discrimination.

135.    After Plaintiff Abdelmalek filed the first written Charge of Discrimination against Duke on November 13, 2017, Dr. Muir retaliated against her and redoubled his efforts to drive her from Duke.

136.    When Plaintiff Abdelmalek has objected to the sex and ethnic discrimination against her or refused to acknowledge the accuracy of allegations made by Dr. Muir, he has accused her of a failure to take ownership of her actions and used her objection to discrimination as a reason to withhold pay from her and place her on a continued performance improvement plan.

### Plaintiff Abdelmalek's Early Encounters with Dr. Muir

137.    Upon Plaintiff Abdelmalek's arrival at Duke in 2006, Dr. Muir assumed he could control her and use her to support his own work because she was a female from Egypt.

138.    Plaintiff Abdelmalek outranked Dr. Muir when she arrived in 2006 as an Associate Professor because he was an untenured Assistant Professor.

139.    Dr. Muir did research on the Hepatitis C virus ("HVC"); Plaintiff Abdelmalek did research on non-alcoholic fatty liver disease.

140.    Dr. Muir nevertheless sought to serve as Plaintiff Abdelmalek's mentor and reporting manager in his position as Director of Site-Based Research.

141.    Plaintiff Abdelmalek successfully argued that she should report to Dr. Anna Mae Diehl, not Dr. Muir, and that she should be allowed to develop and lead an independent research program for NAFLD while Dr. Muir independently led the HCV research program.

142. The Site-Based Research Programs within the GI Division were divided into two separate fiscally independent research hubs, one for HCV and another for NAFLD.

143. Ever since that time, Dr. Muir has been working to undermine Plaintiff Abdelmalek and assume control of her research.

144. Since Plaintiff Abdelmalek's arrival at Duke, a cure has been developed for Hepatitis C, such that research dollars to support Muir's specialized research in that area have been greatly reduced.

145. By contrast, NAFLD research, Plaintiff Abdelmalek's area of specialty, has been vibrant and well-funded. It has seen strong scientific advances, in part because of the efforts of Plaintiff Abdelmalek and her Duke mentor, Dr. Anna Mae Diehl.

**Dr. Muir Reprimands Plaintiff Abdelmalek for Speaking Her Native Language to a Patient**

146. In 2008, Dr. Muir was serving as the GI Division's Manager of Clinical Practice. In this position he helped to oversee the management of patients with liver disease.

147. In early August 2008, Plaintiff Abdelmalek was treating a hospitalized patient from Winston-Salem, a 31-year-old lawyer, whose liver transplant had been performed at Duke. This particular patient had a complication requiring a repeat transplant.

148. Plaintiff Abdelmalek was consulting with the patient and her distraught mother, who were both Egyptian. The mother's primary language was Arabic.

149. Other personnel from the transplant program were present during Plaintiff Abdelmalek's encounter with the patient and her mother.

150. Because the patient's mother did not understand what Plaintiff Abdelmalek was saying in English, Plaintiff Abdelmalek switched to Egyptian Arabic to ensure that patient' mother comprehended the  discussion.

Case 1:19-cv-00664-CCE-LPA   Document 39   Filed 05/20/20   Page 21 of 58

151.    Plaintiff Abdelmalek explained to them the medical issues, the need for re-transplantation, and the option of having the re-transplantation done at an alternative medical center.

152.    After she had finished, she told the staff in the room what she had said in English.

153.    On August 13, 2008, Dr. Muir met with Plaintiff Abdelmalek and informed her that he had two anonymous complaints about her interactions with this patient and her speaking Arabic in the presence of other Duke employees.

154.    Dr. Muir reprimanded Dr. Abdelmalek for speaking Arabic to the patient and her mother, telling her that her use of their native tongue was "unprofessional."

### Dr. Muir Attempts to Take Plaintiff Abdelmalek's Research Funds

155.    In 2010, at a time when Dr. Muir had overspent his own research budget, Plaintiff Abdelmalek discovered that Muir had transferred $63,000 from one of her research accounts into his own overdrawn research account.

156.    Plaintiff Abdelmalek reported the unauthorized transfer of funds to then Division Chief Anna Mae Diehl who required Dr. Muir to restore the funding to Plaintiff Abdelmalek's account.

### Dr. Muir Uses His New Authority as Division Chief Against Plaintiff Abdelmalek

157.    In May 2014, Dr. Anna Mae Diehl was removed as the GI Chair and Dr. Muir was appointed as the new Chair by then Chair of Medicine Klotman. This change was announced without the job being opened for other candidates.

158.    Once he became GI Division Chief, Dr. Muir did everything possible to seize control of Plaintiff Abdelmalek's funding and her sizable and lucrative research program.

22

159.    In 2015, within a year of becoming Chair, Division Chief Muir obstructed an opportunity for Plaintiff Abdelmalek to bring a multicenter study to the Duke Clinical Research Institute (DCRI) where he also served as Director of GI Research.

160.    To get the grant, Plaintiff Abdelmalek asked Dr. Muir to appoint her as a salaried employee at the Duke Clinical Research Institute (known as "Faculty A" appointment).

161.    This appointment would have allowed her to act as the Coordinating Principal Investigator for the proposed clinical trial.

162.    In his authority as both Director of Gastroenterology and Hepatology Research at the Duke Clinical Research Institute and as Chief of the GI Division, Muir refused to support Plaintiff Abdelmalek's appointment.

163.    Muir instead proposed that he would serve as the Coordinating Principal Investigator, thereby allowing him to control the proposed grant in excess of $3 million dollars.

164.    The grant was for a study that was within Plaintiff Abdelmalek's area of expertise, not Dr. Muir's.

165.    Dr. Muir nevertheless sought to control the approximately $3,000,000 in funding that would have come with the clinical trial.

166.    Plaintiff Abdelmalek had written the protocol, secured collaborative participating sites, and obtained FDA approval for the clinical trial.   Under common and accepted academic practice, she should have been allowed to act as the Principal Investigator for the multicenter study.

167.    Dr. Muir did not want a female, especially an ethnic minority female, to obtain the prestige from the clinical trial and the financial control of the research funds at the DCRI.  His mode of operation has been to use ethnic minorities to advance his own career.

23

168.	Because of Dr. Muir's refusal, Plaintiff Abdelmalek took the grant outside of Duke and contracted for the coordination of the clinical trial to take place elsewhere. She successfully completed the work.

169.	Due to the nature of Plaintiff Abdelmalek's other ongoing research (collaborative clinical-translational research studies and clinical trials) and the fact that she has human subjects enrolled at Duke, none of her other work can be readily moved away from Duke.

170.	If Plaintiff Abdelmalek is forced out of Duke, or voluntarily leaves Duke because of the ongoing discrimination against her, Dr. Muir will effectively inherit millions of dollars in research funds and become the Principal Investigator on more than twenty-five ongoing clinical studies and a program of 18+ employees.

171.	Dr. Muir has attempted to drive Plaintiff Abdelmalek away from Duke using his administrative stature and connections with upper leadership and assume control of her research, believing that he can do so because she is an ethnic minority female who will not be able to resist him.

172.	Dr. Muir has used his position as GI Division Chief to underpay Plaintiff Abdelmalek, deny her earned financial incentives, delay her promotion to Full Professor, deny her administrative and clinical support, deny her adequate space for her program, place her on unjustified Performance Improvement Plans, and tarnish her opportunities for leadership and advancement.

**Dr. Muir Delays Plaintiff Abdelmalek's Promotion to Full Professor**

173.	During 2015, Division Chief Muir delayed Plaintiff Abdelmalek's application for promotion to the rank of Full Professor.

24

174. By Spring 2015, Plaintiff Abdelmalek had prepared her dossier and submitted it to Muir for forwarding to the tenure committee.

175. Instead of advancing Plaintiff Abdelmalek's promotion dossier, Division Chief Muir submitted his own dossier and that of another male candidate.

176. There was no reasonable justification for Muir to advance his own dossier and that of the other male professor to the tenure committee instead of Plaintiff Abdelmalek's.

177. Plaintiff Abdelmalek's promotion to the rank of Full Professor was thereby delayed for two years by Dr. Muir.

178. Because he submitted his own dossier, Dr. Muir was promoted to Full Professor during the 2015-2016 academic year.

179. By delaying Plaintiff Abdelmalek's promotion, Dr. Muir ensured that he could advance to Full Professor more quickly than she did, although he was 3 years her academic junior.

180. As a result of Plaintiff Abdelmalek's delayed promotion, she lost additional salary and benefits that would have accompanied her promotion to rank of Full Professor with tenure. She continues to suffer these financial losses on an ongoing basis.

**Plaintiff Abdelmalek Complains About Gender Discrimination At A Meeting**

181. On March 2, 2016, Plaintiff Abdelmalek attended a meeting to discuss giving one of her staff members access to Duke's new electronic medical records. During the meeting, Dr. Ken Lyles (white male, US origin), the Director of the Duke Clinical Research Unit, threatened Plaintiff Abdelmalek saying that he would like to "wring [her] neck."

182. Plaintiff Abdelmalek calmly explained that she had worked hard to earn her position and her seat at the table. She told him that his comments were "unprofessional."

25

183.    This exchange took place in the presence of Dr. Muir and Business Manager O'Neill, both of whom remained silent during the meeting and did not renounce the hostile statement by a Duke administrator.

184.    On March 4, 2016, Plaintiff Abdelmalek complained to Dr. Muir about the way she had been treated, saying that she felt the leadership at Duke was hostile toward her and had slandered her character and style because of her gender and ethnicity.

185.    Plaintiff Abdelmalek complained about the fact that such discrimination enforces the "glass ceiling" for women and particularly for minority women at Duke in academic medicine.

186.    Dr. Muir responded by telling Plaintiff Abdelmalek that Duke is a Southern sexist institution and that she simply needed to do her best to get along and learn "soft skills."

187.    Dr. Muir told her that if she could not conform to these cultural norms at Duke, then she should just leave the University.

188.    Duke recommended that Plaintiff Abdelmalek attend executive coaching and counseling. Plaintiff Abdelmalek followed this advice, even though the issue she had raised was institutional bias and lack of inclusion as it pertains to gender and ethnic differences.

189.    Instead of addressing the concerns about discrimination raised by Plaintiff Abdelmalek, Dr. Muir condoned the behavior of his white male colleague and expected Plaintiff Abdelmalek to accept it.

## Dr. Muir Denies Plaintiff Abdelmalek Proper Salary

190.    On or about July 1, 2016, Plaintiff Abdelmalek requested a salary increase to a level of $350-400K, commensurate with the amount of money that she was bringing into the University and what she understood her white male counterparts were being paid.

26

191.    Plaintiff Abdelmalek's request for the increase was an equity adjustment to bring her up to the level of male physicians in the Department of Medicine with credentials, experience and training equal to or less than hers.

192.    The Chair of the Department of Medicine at that time, Dr. Mary Klotman, approved a salary increase to $325,000, but Dr. Muir blocked this increase and set Plaintiff Abdelmalek's salary at only $307,500.

193.    Plaintiff Abdelmalek's salary was set at this level despite the fact that she had brought more than $10,000,000 in research grant money into Duke and had ample money from her grant funding to pay the additional salary after covering all her direct research costs.

**Dr. Muir Denies Plaintiff Abdelmalek Proper Administrative Assistance**

194.    Plaintiff Abdelmalek runs one of the largest academic site-based clinical research programs at Defendant, with millions of dollars in grant money.

195.    Plaintiff Abdelmalek is also active in multiple professional organizations and both produces and reviews numerous academic medical papers each year.

196.    When Plaintiff Abdelmalek's administrative assistant left in 2017, Dr. Muir refused to allow Plaintiff Abdelmalek to hire another assistant, requiring Plaintiff Abdelmalek to perform her own secretarial work and scheduling for almost an entire year.

197.    No comparable male doctor has been denied administrative assistance by Dr. Muir.

198.    No comparable white doctor has been denied administrative assistance by Dr. Muir.

199.    No comparable doctor of U.S.-origin has been denied administrative assistance by Dr. Muir.

**Dr. Muir Coordinates His Discrimination Against Plaintiff Abdelmalek with ARPM Bishop**

200.    During Summer 2016, Duke appointed Tammy Bishop, a white U.S. origin female, as the Assistant Research Practice Manager to work in the NAFLD research program run by Plaintiff Abdelmalek.

201.    Ms. Bishop was part of a relatively new Duke entity, the Clinical Research Unit ("CRU").

202.    The CRU was created after it became public knowledge that Dr. Anil Potti had committed scientific fraud by faking data in a cancer research program at Duke.

203.    The CRU was designed so that its employees reported to administrators of the CRU and not to the doctors, division chiefs and department heads where the research was being conducted.

204.    Accordingly, ARPM Tammy Bishop reported to managers in the CRU, including Research Practice Manager Elaine Dowdy (white female, US national origin) and Director of the CRU, Susanna Naggie (white female, US national origin).

205.     By design, ARPM Bishop does not report to Dr. Muir, the Chief of the GI Division or to the Chair of the Department of Medicine.

206.    However, as soon as ARPM Bishop was assigned to work in Abdelmalek's program, Dr. Muir began to have weekly meetings with her where he enlisted Bishop in an effort to undermine Plaintiff Abdelmalek's relationship with her staff.

207.    On November 14, 2017, Plaintiff Abdelmalek filed her initial Charge of Discrimination against Defendant alleging that she had been subjected to gender and ethnic discrimination and retaliation.

208.    In this Charge of Discrimination, Plaintiff Abdelmalek specifically named Dr. Muir as one of the Duke administrators discriminating against her.

209.     On information and belief, Dr. Muir was made aware of this Charge of Discrimination within a week of it being filed and participated in formulating the Respondent's Statement that Duke filed at the EEOC to defend itself.

210.     Dr. Muir worked with ARPM Bishop and used information from her to assist him in his efforts to remove Plaintiff Abdelmalek from her job at Duke.

211.     ARPM Bishop took adverse actions against Plaintiff Kigongo as a means of removing him from the management of Abdelmalek's research and making it more difficult for her to do her work.

212.     Dr. Muir and ARPM Bishop conspired together and made a coordinated effort to undermine the work and reputation of both Plaintiffs.

213.     When they took adverse employment actions against Plaintiffs, Dr. Muir and ARPM Bishop were motivated by the race/ethnicity of Plaintiffs.

214.      When they took adverse employment actions against Plaintiffs, Dr. Muir and ARPM Bishop were retaliating against Plaintiffs because of Plaintiffs' opposition to gender and or race/ethnic discrimination.

## **Plaintiff Abdelmalek Appears Before the Dean's Faculty Advisory Council**

215.     In Spring 2017, Dr. Muir implemented a plan to work with administrators at Duke on a false complaint against Plaintiff as a means of terminating her.

216.     The plan was to have her brought before the Dean's Advisory Council.

217.     In consultation with Dr. Mary Klotman (then-Chair of Medicine), Dr. Muir worked with Dr. Anne Brown and Dr. Laura Svetkey to accuse Plaintiff Abdelmalek of a "lack of professionalism."

29

218.    Based upon these false accusations, Plaintiff Abdelmalek had to appear before the Dean's Advisory Council.

219.    During Summer 2017, a Council hearing was conducted before eight faculty members without any recognized form of due process for Plaintiff Abdelmalek.

220.    Duke was represented by its counsel, Kate Hendricks. Plaintiff Abdelmalek was denied the right to have counsel present.

221.    Dr. Muir acted as prosecutor of Plaintiff Abdelmalek basing his case on hearsay and anonymous complaints. Plaintiff Abdelmalek was not allowed to confront, address or question her supposed accusers.

222.    The Faculty Advisory Council did not thoroughly investigate the hearsay complaints and instead endorsed Dr. Muir's reports of misconduct.

223.    The recommendation of the Council went to the new dean, Dr. Mary Klotman, for a decision.

224.    In July 2017, Dean Klotman made a decision based upon a recommendation she herself had made when she was the Chair of Medicine. Klotman's ruling upon her own recommendation was a clear conflict of interest and obvious violation of due process.

225.    These procedures were not just unfair to Plaintiff Abdelmalek. They were a violation Defendant's own policies and the fundamental right of due process.

### Dr. Muir and ARPM Bishop Attack Plaintiff Abdelmalek's Staff including her Sr. Clinical Research Coordinator (Plaintiff Kigongo) and her Administrative Assistant (Kayotta Johnson)

226.    Since ARPM Bishop joined the NAFLD research unit, Dr. Muir has met with her and worked together with her to undermine the work of both Plaintiffs.

Case 1:19-cv-00664-CCE-LPA   Document 39   Filed 05/20/20   Page 30 of 58

227. ARPM Bishop met with Plaintiff Abdelmalek's staff at times when Plaintiff Abdelmalek was not present and encouraged them to provide her with negative information about Plaintiff Abdelmalek .

228. Two employees who were outspoken supporters of Plaintiff Abdelmalek (Plaintiff Kigongo and Administrative Assistant Kayotta Johnson).

229. Plaintiff Kigongo and Administrative Assistant Kayotta Johnon had no negative information about Plaintiff Abdelmalek and refused to fabricate any negative information about Plaintiff Abdelmalek to ARPM Bishop.

230. Both were then disciplined by ARPM Bishop with Dr. Muir's encouragement.

231. On February 1, 2018, ARPM Bishop gave Plaintiff Kigongo an unjustified written warning regarding cell phone usage.

232. On March 22, 2018, ARPM Bishop put Plaintiff Kigongo on an unjustified Performance Improvement Plan (PIP).

233. This PIP was a direct threat to Kigongo's continuing employment at Duke under the Human Resources policies of Defendant.

234. On March 27, 2018, Dr. Muir and Business Manager O'Neill met with Plaintiff Abdelmalek in Muir's office.

235. At that meeting, Dr. Muir informed Plaintiff Abdelmalek that she should "help Mr. Kigongo take another seat on the bus" and that if she were unwilling to do so that they would "let the HR thing play out."

236. In April 2018, ARPM Bishop presented Kigongo with an unjustified annual evaluation known at Duke as a Performance Evaluation and Planning ("PEP") that ranked him overall as "Needs Improvement."

237.    This PEP was the equivalent of an "Unsatisfactory" rating and was a direct threat to Plaintiff Kigongo's continuing employment under Defendant's Human Resources policies.

238.    In his entire career at Duke, Plaintiff Kigongo had never before received an overall rating of "Needs Improvement."

239.    On June 15, 2018, Plaintiff Kigongo filed a Charge of Discrimination with EEOC alleging race/national origin discrimination and retaliation against him.

240.    In his Charge of Discrimination, Plaintiff Kigongo alleged "I have observed that the Administration at Duke has treated Dr. Abdelmalek differently from white male US citizens who are doctors and/or clinical researchers."

241.    Plaintiff Kigongo's Charge of Discrimination went on to name Dr. Muir, Business Manager Cathy O'Neill, and ARPM Tammy Bishop as Duke administrators who had denied Plaintiff Abdelmalek administrative support, refused to work with her to remove an incompetent employee, and subjected her research program to an unusual level of scrutiny and audit investigations.

242.    Plaintiff Kigongo noted in his Charge of Discrimination that he had supported Plaintiff Abdelmalek in her disputes with Duke and that he was viewed by Muir, O'Neill, and Bishop as being supportive of Abdelmalek.

243.    ARPM Bishop also acted against Plaintiff Abdelmalek's new Administrative Assistant, Kayotta Johnson (African-American female).

244.    In June 2018, ARPM Bishop wrongfully accused Johnson of "falsifying a time card" at the direction of Plaintiff Kigongo.

245.    ARPM Bishop claimed that Plaintiff Kigongo and Kayotta Johnson had violated federal labor laws.

32

246.    Based on these false accusations by ARPM Bishop, on or about July 23, 2018, James

Nieman, Defendant's HR Manager for the Department of Medicine, suspended Plaintiff Kigongo

from his job and placed him on administrative leave.

247.    After HR Manager Nieman investigated, Plaintiff Kigongo was returned to work.

248.    ARPM Bishop then attempted to discipline Ms. Johnson over the alleged violation of the

law.

249.    Ms. Johnson refused to sign a written warning from ARPM Bishop and instead noted that

before this complaint was made against her ARPM Bishop had been attempting to gather

negative information about Plaintiff Abdelmalek and that Johnson had refused to provide

anything negative.

### Plaintiff Abdelmalek is Subjected to Unwarranted Investigations and Audits

250.    Plaintiff Abdelmalek has been subjected to repeated and unwarranted audits and

investigations and heightened scrutiny by Defendant's leadership.

251.    Despite going through routine and regular audits by several regulatory oversight entities

(corporate study sponsors, contract research organizations, Defendant's own Office of Billing

and Compliance), Plaintiff Abdelmalek's research program has been subjected to a billing,

compliance, and regulatory audit based on "anonymous" complaints.

252.    One such audit was conducted while Plaintiff Abdelmalek was away at an international

meeting of the European Association for the Study of Liver Disease (EASL) from April 8-13,

2018.  Defendant refused to delay the audit pending Plaintiff Abdelmalek's return.

253.    On all counts, the April 2018 audit showed no improper actions by Plaintiff Abdelmalek

or any substantial discrepancies in her research.

33

254.    On April 30, 2018, Plaintiff Abdelmalek filed a second Charge of Discrimination against Defendant in which she specifically named Dr. Muir and ARPM Bishop as discriminating against her on the basis of her gender and ethnicity.

255.    In her second Charge, Plaintiff Abdelmalek noted that ARPM Bishop was attempting to undermine her research program and was making false accusations about the work of Plaintiff Kigongo.

256.    Thereafter, in May 2018, based additional "anonymous allegations," an outside lawyer, Patricia Holland, was brought in to interview Plaintiff Abdelmalek's staff about her alleged "lack of professionalism" in dealing with her research staff.

257.    During the investigation by Attorney Holland, Plaintiff Abdelmalek directly informed Holland that Defendant was discriminating against her because of her gender, race, and national origin.

258.    On or about April 30, 2018, Attorney Holland interviewed Plaintiff Kigongo.

259.    During the interview, Plaintiff Kigongo denied that Plaintiff Abdelmalek had done anything wrong and stated that the allegations of misconduct against her by Defendant were not true and were due to her cultural and ethnic origin.

260.    Plaintiff Kigongo specifically told Attorney Holland that he believed the anonymous complaints against Dr. Abdelmalek had originated with ARPM Tammy Bishop.

261.    No substantial issues were discovered by Attorney Holland.

262.    On information and belief, these "anonymous" allegations were manufactured and falsely contrived by ARPM Tammy Bishop under the guidance and/or in coordination with Dr. Andrew Muir.

**Dr. Muir Denies Plaintiff Abdelmalek Earned Clinical Incentives**

263.    Plaintiff Abdelmalek earns financial incentives for clinical work that she performs, i.e. for treatment of patients.

264.    Financial incentives are paid for physicians who perform a specified number of patient encounters, measured by "relative value units" or "RVU's."

265.    Plaintiff Abdelmalek significantly exceeded her RVU benchmarks for receiving incentive pay for 2016/2017 academic year.  She therefore earned her clinical incentives in that year.

266.    Nevertheless, in October 2017, Dr. Muir refused to pay Plaintiff Abdelmalek the money she had earned as clinical incentive payments.

267.    Since that time Dr. Muir has cut Plaintiff Abdelmalek's ability to do clinical work and earn additional clinical incentive payments.

268.    But for the unlawful actions of Defendant, Plaintiff Abdelmalek would have been able to earn her clinical incentive payments up to the present.

269.    Plaintiff Abdelmalek last received the clinical incentive payments for her work in the 2015/2016 academic year.  She was paid $14,431 for that year.

270.    Because of the unlawful behavior of Defendant, Plaintiff Abdelmalek has lost clinical incentive payments of approximately $43,293 for the subsequent three academic years.

271.    Upon information and belief, during the past three years, males in the GI Division have not been denied proper payment of earned clinical incentives or denied the right to do clinical work and thereby earn clinical incentive payments.

272.    Upon information and belief, during the past three years, white physicians in the GI Division have not been denied proper payment of earned clinical incentives or denied the right to do clinical work and thereby earn clinical incentive payments.

35

273.    Upon information and belief, during the past three years, US origin physicians in the GI Division have not been denied proper payment of earned clinical incentives or denied the right to do clinical work and thereby earn clinical incentive payments.

### Dr. Muir Denies Plaintiff Abdelmalek Her Financial Research Incentives

274.    Plaintiff Abdelmalek performs academic research in the GI Division and the Duke Clinical Research Institute (DCRI), both of which are overseen by Dr. Muir.

275.    If she meets certain benchmark measures for her research, she is supposed to receive financial research incentives.

276.    One of these incentives is for work at the DCRI. Plaintiff Abdelmalek completed the work necessary to obtain a research incentive payment of $1,981 for DCRI study #5693 Nash Liver Fibrosis With Cirrhosis.

277.    The second of these incentives is governed by the Research Incentive Plan adopted by the Department of Medicine.

278.    Under the Research Incentive Plans adopted for academic years 2016-2017, 2017-2018 and 2018-19, Plaintiff Abdelmalek has earned research incentives of approximately $20,000 per year or approximately $60,000 total.

279.    Despite Plaintiff Abdelmalek earning these two types of research incentive payments, Dr. Muir has refused to pay them.

280.    On information and belief, such payments have not been denied to comparable male researchers in the GI Division.

281.    On information and belief, such payments have not been denied to comparable white researchers or researchers with a U.S. national origin in the GI Division.

36

282.    Up to the present, Plaintiff Abdelmalek is being wrongfully denied financial research incentives on an ongoing basis by Dr. Muir.

## Dr. Muir Denies Plaintiff Abdelmalek Proper Clinical Assistance

283.    Plaintiff Abdelmalek works as a physician treating patients in the Gastroenterology Clinics at Duke University Medical Center.

284.    A physician's assistant who worked with Plaintiff Abdelmalek left the program in 2017.

285.    Plaintiff Abdelmalek repeatedly asked Dr. Muir for permission to hire a physician's assistant or other mid-level provider to replace him, but Dr. Muir has refused to allow her to do so.

286.    Physicians in the GI Division are often provided with doctors or graduate students on fellowships to assist with their work.

287.    Dr. Muir did not provide Plaintiff Abdelmalek a fellow-trainee to support her clinics and off-set the clinical burden of seeing patients, documenting encounters or performing the necessary post-clinic follow-up communications.

288.    No comparable male doctor was denied a physician assistant, mid-level provider or fellow-trainee by Dr. Muir.

289.    No comparable white doctor was denied a physician's assistant, mid-level provider or fellow-trainee by Dr. Muir.

290.    No comparable doctor of U.S.-origin was denied a physician assistant, mid-provider or fellow-trainee by Dr. Muir.

## Dr. Muir Cuts Plaintiff Abdelmalek's On-Call Assignments

291.    Plaintiff Abdelmalek performs call duty, acting as a doctor at various locations owned by Defendant, including Duke Regional Hospital and Duke Raleigh Hospital.

292.    Dr. Muir prohibited Plaintiff Abdelmalek from performing this call duty.

293.    As a result, Plaintiff Abdelmalek has lost supplemental income and has had her credentials to practice at Duke Raleigh Hospital revoked due to lack of patient contact in the past 2 years.

294.    No comparable male doctor was denied call duty or equal opportunity for supplemental income by Dr. Muir.

295.    No comparable white doctor was denied call duty or equal for supplemental income by Dr. Muir.

296.    No comparable doctor of U.S.-origin was denied call duty or equal for supplemental income by Dr. Muir.

297.    Up to the present, Plaintiff Abdelmalek has lost approximately $40,000/year for the past 2 years because of the denial of call duty.

### Dr. Muir Places Plaintiff Abdelmalek on Unjustified Performance Improvement Plans

298.    In September 2017, Dr. Muir, in coordination with Dean Klotman, placed Plaintiff Abdelmalek on an unjustified Performance Improvement Plan ("PIP").

299.    The following year, despite Plaintiff Abdelmalek's good performance and completion of all the material aspects of the PIP, Dr. Muir, with the approval of Dean Klotman and Dr. Joseph Rogers, Interim Chair for the Department of Medicine, renewed the plan for the current year.

300.    As of the date of this Complaint, Plaintiff Abdelmalek remains on the PIP.

301.    There was no substantial justification for placing Plaintiff Abdelmalek on either PIP.

302.    With the exception of Plaintiff Abdelmalek having filed three separate EEOC Charges of Discrimination starting in November, 2017, there was no reason for the continuation of the original PIP.

303. No comparable male doctor has been placed on a Performance Improvement Plan in similar circumstances.

304. No comparable white doctor has been placed on a Performance Improvement Plan in similar circumstances.

305. No comparable doctor of U.S.-origin has been placed on a Performance Improvement Plan in similar circumstances.

## Plaintiff and Her Co-Principal Investigator Object to the Performance Improvement Plan and Annual Evaluation of Plaintiff Kigongo

306. As set forth above, ARPM Bishop contrived reasons to discipline Plaintiff Kigongo and take adverse employment actions against him as a means of driving him from the workplace.

307. On or about March 22, 2018, ARPM Bishop presented Plaintiff Kigongo with an unjustified Performance Improvement Plan or PIP.

308. In April 2018, ARPM Bishop gave Plaintiff Kigongo a "Needs Improvement" annual performance evaluation or PEP.

309. Since 2010, Plaintiff Abdelmalek (in conjunction with her Co-Principal Investigator Dr. Anna Mae Diehl) had acted as Kigongo's supervisor.

310. All of Plaintiff Kigongo's written performance reviews were at least satisfactory.

311. Plaintiff Kigongo's evaluation for 2017, the year before ARPM Bishop took over his review from Plaintiff Abdelmalek, was an overall rating of "Exceptional."

312. Before ARPM Bishop took disciplinary actions against Plaintiff Kigongo and did his annual evaluation, she did not consult with Plaintiff Abdelmalek and Dr. Diehl.

313. At the time that Bishop delivered her PIP and PEP to Plaintiff Kigongo, it was not clear to either Plaintiff Abdelmalek or Dr. Diehl whether they were still Plaintiff Kigongo's supervisors.

39

314.    As Principal Investigators on clinical research studies, they were still responsible to regulatory authorities for the work done by Plaintiff Kigongo as well as all financial support for his salary.

315.    When Plaintiff Abdelmalek and Dr. Diehl found out that ARPM Bishop had given a PIP and a "Needs Improvement" PEP to Plaintiff Kigongo, they protested to Duke's administration on the grounds that the evaluations were not an accurate assessment of his performance.

316.    Despite these protests, Defendant condoned and endorsed the unfair PIP and PEP.

317.    Plaintiff Kigongo was continued on a PIP until Summer 2019.

### Additional Adverse Actions Against Plaintiff Abdelmalek

317.1.  After Plaintiff Abdelmalek filed her third Charge of Discrimination against Respondent, Defendant Duke continued to take adverse actions against her in an effort to drive her from the workplace.

317.2.  These adverse actions against Plaintiff constitute discrimination against her on the basis of her race/national origin and/or gender.

317.3.  These additional adverse actions constitute retaliation against Plaintiff for the assertion of her right to be free from discrimination and her objections to race/national origin and/or gender discrimination.

317.4.  On or about December 6, 2019, Plaintiff filed a Charge of Discrimination at the EEOC with regard to the adverse actions set forth below (EEOC Charge Number 433-2020-00731).

317.5.  On or about March 5, 2020, the EEOC issued a Notice of Right to Sue closing the case and allowing Plaintiff to file these claims in court.

**First Additional Adverse Action: Continuation of Performance Improvement Plan**

317.6.  Plaintiff was continued on a Performance Improvement Plan without any justification for doing so.  Plaintiff should have been removed from the Performance Improvement Plan by July 1, 2019 if not sooner, but the Performance Improvement Plan continues in effect today.  Plaintiff has been given no performance metrics which would allow her to complete the Performance Improvement Plan.

**Second Additional Adverse Action: Clinical Peer Review Investigation**

317.7.  Plaintiff has been subjected to continued internal investigations.  Sometime in early 2019, on a date known to Duke, but not to Plaintiff, a Clinical Peer Review Investigation was initiated against Plaintiff.

317.8.  On information and belief, this Clinical Peer Review Investigation was initiated because of an anonymous complaint.  Plaintiff was called before a Subcommittee of the Clinical Peer Review Committee on October 11, 2020.

317.9.  The Subcommittee used a phony and fabricated policy to criticize Plaintiff's administration of anesthesia, but when challenged withdrew the policy as mistaken.

317.10. Plaintiff Abdelmalek is currently being asked to answer questions for the Clinical Peer Review Committee itself.  The Clinical Peer Review investigation is ongoing.

317.11. Clinical Peer Review investigations are normally confined to issues with regard to malpractice and the clinical treatment of patients; however, the Clinical Peer Review Committee has indicated that it is investigating Plaintiff's "professionalism."

317.12. To Plaintiff's knowledge, there is no precedent or policy which would allow the Clinical Peer Review Committee to be involved in investigations of "professionalism."

## Third Additional Adverse Action: Denial of Promotion

317.13. On or about June 28, 2019, Plaintiff was denied a promotion to the position of Vice Chief of Research for the Gastroenterology Division. Plaintiff applied for this position and was well qualified for the job.

317.14. The promotion was given to a white female U.S. national, Katie Garmin.

317.15. Plaintiff helped to train Dr. Garmin.

317.16. Dr. Garmin has not published as many scientific research papers as Plaintiff and does not have the same standing in the scientific research community of gastroenterologists that Plaintiff has.

317.17. Dr. Garmin has had scientific research papers on which she was a co-author withdrawn from publication because of concerns with regard to the validity of the research.

317.18. Dr. Garmin was not as well-qualified for this promotion as Plaintiff Abdelmalek.

## Fourth Additional Adverse Action

317.19. Since the filing of Plaintiff Abdelmalek's Third Charge of Discrimination, Defendant has continued to deny Plaintiff her Clinical Incentives and Research Incentives without justification or reason.

317.20. These incentives are paid annually during the first week of October each year.

317.21 Plaintiff Abdelmalek has been denied these incentives for the past three years including on or about October 1, 2019.

## Fifth Additional Adverse Action

317.22. Plaintiff Abdelmalek made a proposal to Division Chief Dr. Andrew Muir for the reconfiguration of the space for the employees working in her research program.

317.23. Her employees are working in cramped makeshift offices while other offices and rooms in the GI Division are largely unoccupied.

317.24. On or about August 23, 2019 and since then, Dr. Muir has denied Plaintiff's request for adequate space for her research program without justification or reason.

## **Plaintiff Kigongo's Damages from Discrimination and Retaliation**

318.     The unfair PIP and PEP caused Plaintiff Kigongo to lose merit raises, bonuses and increases in his retirement benefits.

319.     Defendant has discriminated against Plaintiff Kigongo on the basis of his race and/or national origin.

320.     Defendant has retaliated against Plaintiff Kigongo because of his opposition to race and/or national origin discrimination.

321.     Defendant has retaliated against Plaintiff Kigongo because of his opposition to gender discrimination.

322.     Defendant has retaliated against Plaintiff Kigongo because of his participation in investigations of the claims of gender and ethnic discrimination made by Plaintiff Abdelmalek.

323.     Plaintiff Kigongo has suffered more than $25,000 in economic damages as a result of the unlawful behavior of Defendant set forth above.

324.     Plaintiff Kigongo feared for his job and continues to have anxiety about his job and ability to provide for his family as a result of the unlawful actions of Defendant.

325.     Plaintiff Kigongo has suffered inconvenience and loss of enjoyment of life as a result of Defendant's unlawful actions.

## **Plaintiff Abdelmalek's Damages From Discrimination and Retaliation**

Case 1:19-cv-00664-CCE-LPA   Document 39   Filed 05/20/20   Page 43 of 58

326. Defendant has discriminated against Plaintiff Abdelmalek on the basis of her race and/or national origin.

327. Defendant has discriminated against Plaintiff Abdelmalek on the basis of her gender.

328. Defendant has retaliated against Plaintiff Abdelmalek because of her opposition to race and/or national origin discrimination.

329. Defendant has retaliated against Plaintiff Abdelmalek because of her opposition to gender discrimination.

330. Plaintiff Abdelmalek has suffered more than $25,000 in economic damages as a result of the unlawful behavior of Defendant set forth above.

331. Plaintiff Abelmalek has suffered inconvenience, loss of enjoyment of life and emotional distress as a result of the unlawful actions of Defendant set forth above.

### FIRST CAUSE OF ACTION: SEXUAL, RACIAL AND/OR NATIONAL ORIGIN DISCRIMINATION AGAINST PLAINTIFF ABDELMALEK IN VIOLATION OF TITLE VII OF THE 1964 CIVIL RIGHTS ACT

332. Plaintiff Abdelmalek hereby incorporates by reference the allegations of the above factual allegations in support of this claim for relief.

333. The actions of Defendant as set forth herein constitute intentional discrimination against Plaintiff Abdelmalek on the basis of her sex, race and/or national origin in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981A(a)(1).

334. Defendant engaged in discriminatory practices against Plaintiff Abdelmalek with either malice or reckless indifference to the federally protected rights of Plaintiff Abdelmalek to be free from sexual, racial and/or national origin discrimination in the workplace, as set forth in 42 U.S.C. § 1981A(b)(1).

44

335. As a result of the unlawful actions of Defendant as set forth herein, Plaintiff Abdelmalek has suffered the loss of wages, other financial compensation and benefits of employment.

336. Plaintiff Abdelmalek is entitled to recover for economic losses in an amount greater than $25,000.

337. As a result of the unlawful actions of Defendant as set forth herein, Plaintiff Abdelmalek has suffered compensatory damages including loss of enjoyment of life, inconvenience, mental suffering, and emotional distress.

338. Plaintiff Abdelmalek is entitled to recover compensatory damages as provided by the 1964 Civil Rights Act, 42 U.S.C. § 2000e, *et seq.* (Title VII) in an amount exceeding $25,000 as a proximate result of Defendant's conduct alleged herein.

339. Plaintiff Abdelmalek is entitled to punitive damages as provided by the Civil Rights Act of 1991, 42 U.S.C. § 1981a(1) and (b)(1) in an amount exceeding $25,000 as a proximate result of Defendant's conduct alleged herein.

340. Plaintiff Abdelmalek is entitled to her costs and reasonable attorney's fees incurred for asserting her rights under federal law as set forth in 42 U.S.C. § 2000e-5(k).

**SECOND CAUSE OF ACTION: RETALIATION**
**AGAINST PLAINTIFF ABDELMALEK**
**IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1964**

341. Plaintiff Abdelmalek hereby incorporates by reference the above factual allegations in support of this claim for relief.

342. As set forth above, Plaintiff Abdelmalek objected to discrimination against her on the basis of her gender, race and national origin in direct conversations with Dr. Muir.

343. Plaintiff Abdelmalek filed three separate Charges of Discrimination against Defendant on the basis of these protected characteristics.

344.    The actions of Defendant as set forth herein constitute retaliation against Plaintiff Abdelmalek for the assertion of her right to be free from sexual, racial and/or national origin discrimination.  Such retaliation is in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e-3(a).

345.    As a result of the unlawful actions of Defendant as set forth herein, Plaintiff Abdelmalek has suffered the loss of wages, other compensation, and benefits of employment.

346.    Plaintiff Abdelmalek is entitled to recover for economic losses in an amount greater than $25,000.

347.    As a result of the unlawful actions of Defendant as set forth herein, Plaintiff Abdelmalek has suffered compensatory damages including loss of enjoyment of life, inconvenience, mental suffering, and emotional distress.

348.    Plaintiff Abdelmalek is entitled to recover compensatory damages as provided by the 1964 Civil Rights Act, 42 U.S.C. § 2000e, *et seq.* (Title VII) in an amount exceeding $25,000 as a proximate result of Defendant's conduct alleged herein.

349.    Defendant engaged in retaliation against Plaintiff Abdelmalek with either malice or with reckless indifference to the federally protected rights of Plaintiff Abdelmalek to be free from racial and national origin discrimination in the workplace, as set forth in 42 U.S.C. § 1981A(b)(1).

350.    Plaintiff Abdelmalek is entitled to punitive damages as provided by 42 U.S.C. § 1981 in an amount exceeding $25,000 as a proximate result of Defendant's conduct as alleged herein.

351.    Plaintiff Abdelmalek is entitled to her costs and reasonable attorney's fees incurred for asserting her rights under federal law as set forth in 42 U.S.C. § 2000e-5(k).

## THIRD CAUSE OF ACTION:
## VIOLATION OF THE RECONSTRUCTION ERA STATUTES

## AGAINST PLAINTIFF ABDELMALEK

352.    Plaintiff Abdelmalek hereby realleges and incorporates by reference the factual allegations above as though set forth fully herein.

353.    The actions of Defendant as set forth herein constitute intentional discrimination and retaliation on the basis of Plaintiff Abdelmalek's race in violation of the Reconstruction Era Statutes, 42 U.S.C. § 1981.

354.    As a result of the unlawful actions of Defendant as set forth herein, Plaintiff Abdelmalek has suffered the loss of wages, other forms of compensation and benefits of employment.

355.    Plaintiff Abdelmalek is entitled to recover her economic losses in an amount greater than $25,000.

356.    As a result of the unlawful actions of Defendant as set forth herein, Plaintiff Abdelmalek has suffered compensatory damages including loss of enjoyment of life, inconvenience, mental suffering, and emotional distress.

357.    Plaintiff Abdelmalek is entitled to compensatory damages as provided by the Reconstruction Era Statutes, 42 U.S.C. § 1981, in an amount exceeding $25,000 as a proximate result of Defendant's conduct alleged herein.

358.    Defendant engaged in race discrimination and retaliation against Plaintiff Abdelmalek with either malice or with reckless indifference to the federally protected rights of Plaintiff Abdelmalek to be free from race discrimination in the workplace.

359.    Plaintiff Abdelmalek is entitled to punitive damages in an amount exceeding $25,000 as a proximate result of Defendants' conduct as alleged herein.

360.    Plaintiff Abdelmalek is entitled to her costs and reasonable attorney's fees incurred for asserting her rights under federal law as set forth in 42 U.S.C. § 2000e-5(k).

**FOURTH CAUSE OF ACTION:**
**VIOLATION OF THE EQUAL PAY ACT AGAINST PLAINTIFF ABDELMALEK**

361.    Plaintiff Abdelmalek hereby incorporates by reference the above factual allegations in support of this claim for relief.

362.    Defendant sells and licenses products, charges for the education of students from throughout the United States and numerous foreign countries, and treats patients from throughout the United States and numerous foreign countries thereby acting as an enterprise engaging in commerce within the meaning of the Fair Labor Standards Act of 1938 and the Equal Pay Act, 29 U.S.C. §§ 206, 203(e)(r), and (s).

363.    Plaintiff Abdelmalek is a female researcher and physician employed by Defendant in the Division of Gastroenterology, Department of Medicine.

364.    Plaintiff Abdelmalek is a Full Professor.

365.    Defendant has unlawfully discriminated against Plaintiff Abdelmalek because of her sex by paying wages to the Plaintiff Abdelmalek at rates less than the rates at which pays wages to male employees in the G.I. Division for equal work on jobs, the performance of which require equal skill, effort and responsibility and which are performed under similar working conditions.

366.    Defendant's actions are a violation of the Equal Pay Act, 29 U.S.C. § 206(d)(1).

367.    Defendant has engaged in the discriminatory payment of wages based upon sex as set forth herein during the period since July 3, 2016.

368.    Defendant has refused to provide Plaintiff Abdelmalek with specific information regarding the amount of the wages paid to male Full Professors.

369.    Plaintiff Abdelmalek is informed and believes the median base compensation for a Full Professor in the Duke G.I. Division in 2017 was at least $329,025 while her compensation was

$307,500. Plaintiff Abdelmalek therefore alleges that she has been denied proper compensation of at least $20,000 per year.

370. Defendant has repeatedly and willfully violated the Equal Pay Act by discriminating between employees on the basis of sex as set forth above.

371. Plaintiff Abdelmalek seeks an order that the Defendant pay to Plaintiff Abdelmalek an amount equal to the difference between the wages she actually received and the wages paid to male employees performing equal work within the meaning of §6(d) of the Equal Pay Act with interest thereon.

372. Plaintiff Abdelmalek also seeks liquidated damages as allowed by the Equal Pay Act.

373. Plaintiff Abdelmalek also seeks an order that Defendant pay her costs and reasonable attorney's fees.

**FIFTH CAUSE OF ACTION:**
**VIOLATION OF THE NORTH CAROLINA WAGE AND HOUR ACT**
**AGAINST PLAINTIFF ABDELMALEK**

374. Plaintiff Abdelmalek hereby incorporates by reference the above factual allegations in support of this claim for relief.

375. Defendant has failed to pay Plaintiff Abdelmalek for wages earned within the meaning of the North Carolina Wage and Hour Act.

376. Defendant has specifically refused to pay $1,981 for earned research incentives for DCRI study #5693 NASH Liver Fibrosis Without Cirrhosis.

377. Defendant has also refused to pay approximately $60,000 for Department of Medicine Research Incentive payments Plaintiff Abdelmalek has earned based upon the Department of Medicine Research Incentive Plan.

378.    Defendant has also refused to pay approximately $43,293 for Clinical Incentive Payments earned by Plaintiff Abdelmalek.

379.    All of these incentive payments constitute "wages" under the terms of the NC Wage and Hour Act.

380.    Defendant's failure to pay Plaintiff Abdelmalek wages earned as described herein constitutes a violation of N.C. Gen. Stat. § 95-25.6.

381.    Defendant's actions were willful and not based on any good faith belief of compliance with the law.

382.    Plaintiff Abdelmalek is entitled to recover for back wages plus interest, liquidated damages, cost, and attorney's fees as provided by N.C. Gen. Stat. § 95-25.22.

### SIXTH CAUSE OF ACTION: RACIAL AND/OR NATIONAL ORIGIN DISCRIMINATION AGAINST PLAINTIFF KIGONGO IN VIOLATION OF TITLE VII OF THE 1964 CIVIL RIGHTS ACT

383.    Plaintiff Kigongo hereby incorporates by reference the allegations of the above factual allegations in support of this claim for relief.

384.    The actions of Defendant as set forth herein constitute intentional discrimination against Plaintiff Kigongo on the basis of his race and/or national origin in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981A(a)(1).

385.    Defendant engaged in discriminatory practices against Plaintiff Kigongo with either malice or reckless indifference to the federally protected rights of Plaintiff Kigongo to be free from sexual, racial and/or national origin discrimination in the workplace, as set forth in 42 U.S.C. § 1981A(b)(1).

386.    As a result of the unlawful actions of Defendant as set forth herein, Plaintiff Kigongo has suffered the loss of wages, other financial compensation and benefits of employment.

387.    Plaintiff Kigongo is entitled to recover for economic losses in an amount greater than $25,000.

388.    As a result of the unlawful actions of Defendant as set forth herein, Plaintiff Kigongo has suffered compensatory damages including loss of enjoyment of life, inconvenience, mental suffering, and emotional distress.

389.    Plaintiff Kigongo is entitled to recover compensatory damages as provided by the 1964 Civil Rights Act, 42 U.S.C. § 2000e, *et seq.* (Title VII) in an amount exceeding $25,000 as a proximate result of Defendant's conduct alleged herein.

390.    Plaintiff Kigongo is entitled to punitive damages as provided by the Civil Rights Act of 1991, 42 U.S.C. § 1981(a)(1) and (b)(1) in an amount exceeding $25,000 as a proximate result of Defendant's conduct alleged herein.

391.    Plaintiff Kigongo is entitled to his costs and reasonable attorney's fees incurred for asserting his rights under federal law as set forth in 42 U.S.C. § 2000e-5(k).

## SEVENTH CAUSE OF ACTION: RETALIATION
## AGAINST PLAINTIFF KIGONGO
## IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1964

392.    Plaintiff Kigongo hereby incorporates by reference the above factual allegations in support of this claim for relief.

393.    As set forth above, Plaintiff Kigongo objected to discrimination against Plaintiff Abdelmalek on the basis of her gender, race and national origin and participated in investigations of that discrimination.

394.   As set forth above, Plaintiff Kigongo objected to discrimination against him on the basis of his race/national origin.

395.   Plaintiff Kigongo filed two separate Charges of Discrimination against Defendant alleging retaliation in violation of Title VII.

396.   The actions of Defendant as set forth herein constitute retaliation against Plaintiff Kigongo for the assertion of his rights and participation in the investigations of unlawful discrimination against another.  Such retaliation is in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e-3(a).

397.   As a result of the unlawful actions of Defendant as set forth herein, Plaintiff Kigongo has suffered the loss of wages, other compensation, and benefits of employment.

398.   Plaintiff Kigongo is entitled to recover for economic losses in an amount greater than $25,000.

399.   As a result of the unlawful actions of Defendant as set forth herein, Plaintiff Kigongo has suffered compensatory damages including loss of enjoyment of life, inconvenience, mental suffering, and emotional distress.

400.   Plaintiff Kigongo is entitled to recover compensatory damages as provided by the 1964 Civil Rights Act, 42 U.S.C. § 2000e, *et seq.* (Title VII) in an amount exceeding $25,000 as a proximate result of Defendant's conduct alleged herein.

401.   Defendant engaged in retaliation against Plaintiff Kigongo with either malice or with reckless indifference to the federally protected rights of Plaintiff Kigongo to be free from racial and national origin discrimination in the workplace, as set forth in 42 U.S.C. § 1981A(b)(1).

402.   Plaintiff Kigongo is entitled to punitive damages as provided by 42 U.S.C. § 1981 in an amount exceeding $25,000 as a proximate result of Defendant's conduct as alleged herein.

403.    Plaintiff Kigongo is entitled to his costs and reasonable attorney's fees incurred for asserting his rights under federal law as set forth in 42 U.S.C. § 2000e-5(k).

**EIGHTH CAUSE OF ACTION:**
**VIOLATION OF THE RECONSTRUCTION ERA STATUTES**
**AGAINST PLAINTIFF KIGONGO**

404.    Plaintiff Kigongo hereby incorporates by reference the above factual allegations in support of this claim for relief.

405.    The actions of Defendant as set forth herein constitute intentional discrimination and retaliation on the basis of Plaintiff Kigongo's race in violation of the Reconstruction Era Statutes, 42 U.S.C. § 1981.

406.    As a result of the unlawful actions of Defendant as set forth herein, Plaintiff Kigongo has suffered the loss of wages, other forms of compensation and benefits of employment.

407.    Plaintiff Kigongo is entitled to recover his economic losses in an amount greater than $25,000.

408.    As a result of the unlawful actions of Defendant as set forth herein, Plaintiff Kigongo has suffered compensatory damages including loss of enjoyment of life, inconvenience, mental suffering, and emotional distress.

409.    Plaintiff Kigongo is entitled to compensatory damages as provided by the Reconstruction Era Statutes, 42 U.S.C. § 1981, in an amount exceeding $25,000 as a proximate result of Defendant's conduct alleged herein.

410.    Defendant engaged in race discrimination and retaliation against Plaintiff Kigongo with either malice or with reckless indifference to the federally protected rights of Plaintiff Kigongo to be free from race discrimination in the workplace.

411. Plaintiff Kigongo is entitled to punitive damages in an amount exceeding $25,000 as a proximate result of Defendants' conduct as alleged herein.

412. Plaintiff Kigongo is entitled to his costs and reasonable attorney's fees incurred for asserting his rights under federal law as set forth in 42 U.S.C. § 2000e-5(k).

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray of the Court for the following relief:

1. That all issues of fact raised herein be tried by jury.

2. That the Court declare that the actions undertaken by Defendant as set forth above were unlawful and issue an order prohibiting Defendant from engaging in such actions in the future.

3. That the Court award Plaintiff Abdelmalek more than $25,000 from Defendant in lost wages and other benefits of employment for the violation of Title VII, the exact amount to be determined at the trial of this action.

4. That the Court award Plaintiff Abdelmalek more than $25,000 from Defendant in compensatory damages for the violation of Title VII, the exact amount to be determined at the trial of this action.

5. That the Court award Plaintiff Abdelmalek more than $25,000 from Defendant in punitive damages for sex discrimination for violation of Title VII of the 1964 Civil Rights Act, the exact amount to be determined at the trial of this action.

6. That the Court award Plaintiff Abdelmalek more than $25,000 from Defendant in punitive damages for race/national origin discrimination for violation of Title VII of the 1964 Civil Rights Act, the exact amount to be determined at the trial of this action.

7. That the Court award Plaintiff Abdelmalek more than $25,000 from Defendant in lost wages and other benefits of employment for race discrimination in violation of the Reconstruction Era Statutes, the exact amount to be determined at the trial of this matter.

8. That the Court award Plaintiff Abdelmalek more than $25,000 from Defendant in punitive damages for violation of the Reconstruction Era Statutes, the exact amount to be determined at the trial of this action.

9. That the Court award Plaintiff Abdelmalek more than $25,000 for violation of the Equal Pay Act, the exact amount to be determined at the trial of this matter.

10. That the Court award Plaintiff Abdelmalek more than $25,000 from Defendant in liquidated damages for violation of the Equal Pay Act, the exact amount to be determined at the trial of the action.

11. That the Court award Plaintiff Abdelmalek more than $25,000 from Defendant for violation of the NC Wage and Hour Act, the exact amount to be determined at the trial of this matter.

12. That the Court award Plaintiff Abdelmalek more than $25,000 in liquidated damages for the violation of the NC Wage and Hour Act, the exact amount to be determined at the trial of this action.

13. That the Court award Plaintiff Abdelmalek attorneys' fees pursuant to N.C.G.S § 95-25.22(d), 29 U.S.C. 216(b), and/or 42 U.S.C. § 2000e-5(k).

14. That the Court award the costs incurred by Plaintiff Abdelmalek in connection with prosecution of this action.

15. That the Court award Plaintiff Abdelmalek all interest allowed by law.

16.    That the Court award Plaintiff Kigongo more than $25,000 from Defendant in lost wages and other benefits of employment for the violation of Title VII, the exact amount to be determined at the trial of this action.

17.    That the Court award Plaintiff Kigongo more than $25,000 from Defendant in compensatory damages for the violation of Title VII, the exact amount to be determined at the trial of this action.

18.    That the Court award Plaintiff Kigongo more than $25,000 from Defendant in punitive damages for race/national origin discrimination for violation of Title VII of the 1964 Civil Rights Act, the exact amount to be determined at the trial of this action.

19.    That the Court award Plaintiff Kigongo more than $25,000 from Defendant in lost wages and other benefits of employment for race discrimination in violation of the Reconstruction Era Statutes, the exact amount to be determined at the trial of this matter.

20.    That the Court award Plaintiff Kigongo more than $25,000 from Defendant in punitive damages for violation of the Reconstruction Era Statutes, the exact amount to be determined at the trial of this action.

21.    That the Court award Plaintiff Kigongo attorneys' fees pursuant to 42 U.S.C. § 2000e-5(k).

22.    That the Court award the costs incurred by Plaintiff Kigongo in connection with prosecution of this action.

23.    That the Court award Plaintiff Kigongo all interest allowed by law.

24.    For such other and further relief as the Court may deem just and proper.

Case 1:19-cv-00664-CCE-LPA   Document 39   Filed 05/20/20   Page 56 of 58

This is the 25th day of March, 2019.

GLENN, MILLS, FISHER & MAHONEY, P.A.

/s/ Stewart W. Fisher
Stewart W. Fisher (NC Bar #10327)
Post Office Drawer 3865
Durham, North Carolina 27702-3865
Telephone: (919) 683-2135
Facsimile: (919) 688-9339
E-mail: sfisher@gmfm-law.com

Paul M. Dubbeling (N.C. Bar #47014)
P.M. Dubbeling, PLLC
210 North Columbia Street
Chapel Hill, NC 27514
Telephone: (919) 260-1615
Facsimile: (919) 404-7074
E-mail: Paul.dubbeling@pmdubbeling.com

*ATTORNEYS FOR PLAINTIFF*
*MANAL ABDELMALEK*


DOGGETT LAW OFFICES

/s/ Eric L. Doggett
Eric L. Doggett (N.C. Bar #39639)
3737 Glenwood Ave.
Suite 100
Raleigh NC 27612-5515
Telephone: 919-782-2979
Facsimile: (919-789-2796)
Eric@DoggettLawOffices.com

*ATTORNEYS FOR PLAINTIFF*
*CHRISTOPHER KIGONGO*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I electronically filed the foregoing document, entitled **Second**

**Amended Complaint**, to correct the erroneous document filed on April 1, 2020, with the Clerk

of Court using the CM/ECF system and have verified that the filing was sent electronically using

the CM/ECF system to the following:

Gina Calabro
Robert Sar
Alyssa Riggins
Ogletree, Deakins, Nash, Stewart & Smoak, P.C.
8529 Six Forks Road, Forum IV, Suite 600
Raleigh, NC 27615
Gina.Calabro@ogletree.com
Robert.Sar@ogletree.com
Alyssa.Riggins@ogletree.com
*Attorneys for Defendant*

Eric Doggett
Doggett Law Offices
3737 Glenwood Avenue, Suite 100
Raleigh, NC 27612-5515
Eric@DoggettLawOffices.com
*Attorneys for Plaintiff Christopher Kigongo*

Paul M. Dubbeling
P.M. Dubbeling, PLLC
210 North Columbia Street
Chapel Hill, NC 27514
Paul.dubbeling@pmdubbeling.com
*Attorneys for Plaintiff Manal Abdelmalek*

This is the 20th day of May, 2020.

/s/ Stewart W. Fisher
Stewart W. Fisher (NC Bar #10327)
Glenn, Mills, Fisher & Mahoney, P.A.
Post Office Drawer 3865
Durham, NC 27702-3865
Telephone: (919) 683-2135
Facsimile: (919) 688-9339
sfisher@gmfm-law.com
*Attorneys for Plaintiff Manal Abdelmalek*
